## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARNAVI SpA, as agent for JILMAR SHIPPING S.A., | C.A. No. _____ |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| DONALD P. KEEHAN, ARLENE KEEHAN, ADVANCED POLYMER SCIENCES, INC.; ADVANCED POLYMER COATINGS, LTD F/K/A ADVANCED POLYMER COATINGS LLC, | |
| Respondents. | |

Plaintiff, Marnavi SpA ("Marnavi", as agent for Jilmar Shipping, S.A. ("Jilmar"), by and through its undersigned attorneys, respectfully alleges as against Defendants, Advanced Polymer Sciences, Inc. ("APS"), Advanced Polymer Coatings, Ltd. f/k/a Advanced Polymer Coatings, LLC ("APC"), Donald J. Keehan ("Donald Keehan") and Arlene H. Keehan ("Arlene Keehan", and together with Donald Keehan, the "Keehans", and APS, APC and the Keehans collectively, the "Defendants"), alleges as follows:

### INTRODUCTION

1. The dispute began in 1997 when Marnavi arranged for APS to apply special coatings to the inner hull of a ship called the M/T Joran (the "Joran"). APS botched the job and spent the next nine years fraudulently attempting to limit its liability and financial responsibility for the damage caused to the vessel.

2. Plaintiff brings this action in support of its related petition to enforce a foreign arbitration award, against the defendants and their alter egos. The arbitration award arose from Defendants' breach of a contract with Plaintiff, as agent for Jilmar, the company that owned the vessel the Joran, to coat the cargo tanks of the Joran with an allegedly superior epoxy

that protects mild steel cargo tanks from the corrosive effects of various acids and other toxic substances. The allegedly superior epoxy, Siloxirane, was invented by Defendant Donald Keehan and developed, manufactured and sold by his company, APS.

3.    The Siloxirane didn't perform as promised. Although APS had certified the Joran as able to carry the corrosive cargos, the Joran soon suffered serious damage to its mild steel cargo tanks, which had been installed by the Owners (as defined below) at great costs based on the representations that Siloxirane would enable them to carry the toxic liquids.

4.    After the Owners commenced arbitration proceedings in December 2000 in London, England, seeking compensation for damages to the M/T Joran, the Defendants began a shell game in an attempt to insulate their assets from their many creditors, including the Owners.

5.    Less than six months after the Arbitrator issued his first interim award on the question of jurisdiction in July, 2002, APS entered into receivership proceedings in Ohio, where its principal business offices were located. At the same time, the Defendants alternatively created and changed the names of several Delaware, Ohio and foreign companies, many of which had the same business address, agents, shareholders and executives as APS. Defendants also transferred lines of business activity away from APS to these newly named and renamed companies. Without regard to corporate form or structure, and with overlapping management, the Defendants, in a breach of fiduciary duty to the creditors of the insolvent APS, transferred APS' real and personal property in a continuing, if not brilliant, "catch me if you can" scheme.

6.    Plaintiff therefore seeks judgment against the Defendants and a finding that all of the Keehans' related companies are alter egos of both the Keehans and APS.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

8.      Plaintiff is a foreign corporation.  Defendants APS and APC are companies formed under Delaware law and Defendants Donald J. Keehan and Arlene H. Keehan are residents of Ohio and/or Florida.

9.      The amount in controversy exceeds $75,000.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## PARTIES

11.     Plaintiff Marnavi is an Italian corporation with its principal offices in Naples involved in the business of transporting foodstuffs and chemicals.

12.     Jilmar (hereinafter with "Marnavi", the "Owners") is a corporation organized under the laws of Panama, and was the owner of the shipping tanker the Joran. Marnavi is Jilmar's managing agent.

13.     Upon information and belief, Defendant APS is a corporation organized under the laws of Delaware.  Its principal place of business was at all relevant times in Avon, Ohio.

14.     As of the date of this Complaint, APS' Delaware registration status was "Void", and its Ohio corporation status is listed as "Active".

15.     Upon information and belief, Defendant APC is a limited liability company organized under the laws of Delaware and a subsidiary of APS.  Its principal place of business was at all relevant times in Avon, Ohio.

16.     Upon information and belief APC was and/or is purported to be a subsidiary of APS.

17.     As of the date of this Complaint, APC's registration statuses were as follows:  "good standing" in Delaware and "Active" in Ohio.

18.     Upon information and belief, Defendants Donald J. Keehan ("Keehan Sr.") and Arlene H. Keehan ("Mrs. Keehan") jointly own several homes, and reside, in both Ohio and Florida.  Their Ohio homes are or have been in Avon and Bay Village, Ohio.  Their current Florida residence is in Fort Myers, Florida.

19.     Upon information and belief, Keehan Sr. and Mrs. Keehan are husband and wife and have six children.

20.     One of those children, Donald J. Keehan was born May 1961 ("Keehan Jr.").

21.     Keehan Jr. was and/or is involved in the management and operations of the Defendants.

22.     Upon information and belief, Guaranteed Advanced Tank Technologies, Inc. ("GATT") is a limited liability company organized under section 1705 of the Ohio Revised Code (the "Ohio Code") and a purported subsidiary of APS.

23.     As of the date of this Complaint, GATT had a registration status of "Active" in Ohio.

24.     Upon information and belief, Guaranteed Advanced Tank International, Ltd. ("GATT Int'l") is a company organized under the laws of Barbados.

25.     GATT Int'l's principal place of business was at all relevant times in Bridgetown.

26.     Upon information and belief, 951 Realty Ltd. ("951 Realty") is an Ohio limited liability company.  Its principal place of business was at all relevant times in Avon, Ohio.

27.     As of the date of this Complaint, 951 Realty had a registration status of "Active" in Ohio.

28.     Upon information and belief, Ascus Technologies Ltd ("Ascus") is an Ohio limited liability company.  Its principal place of business was at all relevant times in Avon, Ohio.

29.     As of the date of this Complaint, Ascus had an Ohio registration status of "Active".

30.     Chemline (Europe) Ltd ("Chemline Europe") is a limited liability corporation organized under the United Kingdom Companies Act 1985.

31.     Upon information and belief, Chemline Europe markets and distributes Siloxirane in Europe, as did APS during 1997-2002.

32.     APC holds 50% of the shares of Chemline Europe.

33.     Advanced Polymer Coatings Mexico S.A. ("APC Mexico") is a company organized under the laws of Mexico.

34.     Upon information and belief, APC Mexico markets and distributes Siloxirane in Mexico, a line of business which belonged to APS prior to 2002.

35.     Upon information and belief, APC also does business in Turkey under the name MarineLine Turkey.

36.     Upon information and belief, MarineLine Turkey markets and distributes Siloxirane in Turkey, a line of business which belonged to APS prior to 2002.

37.     Upon information and belief, APC also does business in China under the name and MarineLine China Ltd.

38.    Upon information and belief, MarineLine China markets and distributes Siloxirane in China, a line of business that belonged to APS prior to 2002.

39.    Defendants, GATT, GATT Int'l, 951 Realty, Ascus, Chemline Europe, Chemline Mexico, MarineLine Turkey and MarineLine China, Ltd, shall be collectively referred to as the "Keehan Companies".

40.    Non-party Cantiere Naval SEC, Societa Esercizio Cantiere Group SpA ("Cantiere"), a shipyard engaged in the building of chemical tankers, is an Italian corporation with its principal office in Viareggio, Italy.

41.    Non-party John M. Manos is an Ohio licensed attorney, who at all relevant times acted as counsel for the Keehans, APS, APC and/or various other Keehan Companies ("Manos").

42.    Manos is also President of Ascus.

43.    Upon information and belief, Non-party Denise Keehan is the Keehans' daughter, and was former Vice-President of APS and a Vice-President and Director of GATT.

## FACTUAL BACKGROUND

44.    Upon information and belief, Defendant Donald Keehan is the individual responsible for the development of siloxirane coating ("Siloxirane"), a lining system for, *inter alia*, the cargo tanks of maritime chemical tankers.

45.    Donald Keehan incorporated APS as a Delaware close corporation in 1986 to develop and exploit the Siloxirane technology.

46.    Upon information and belief, Defendants and the Keehan Companies were and/or are all involved in the manufacture and/or sale of Siloxirane.

## THE DEFENDANTS FRAUDULENTLY INDUCE THE
## <u>OWNERS TO COAT THE JORAN WITH SILOXIRANE</u>

47.     The Joran is a 3,300 deadweight ton-tanker originally built to carry food products.

48.     During the years 1996 and 1997, GATT and APS sought to have the International Maritime Organization ("IMO") approve the use of Siloxirane as a suitable barrier against highly corrosive IMO II-III mineral acids stored in mild steel cargo tanks on seagoing vessels.

49.     During late 1996 and early 1997, Cantiere, APS' exclusive agent in Italy, stated that if Jilmar coated the Joran's storage tanks with Siloxirane it would qualify the Joran to carry dangerous chemical cargos in mild steel tanks under IMO rules for carrying such substances.

50.     Cantiere provided Jilmar with APS sales literature which described Siloxirane as more resistant than 98% of all other epoxy coatings and even more resistant than stainless steel.

51.     In reliance on these representations, on or about July 28, 1997, Marnavi, acting on behalf of Jilmar, and APS, GATT and Cantiere entered into an agreement (the "Agreement") providing that APS, GATT and Cantiere would supply and supervise the application of Siloxirane to the Joran's cargo tanks.

52.     APS-GATT had identical responsibilities under the Agreement.

53.     APS-GATT agreed (i) to record and read all data relating to a test tank and the final tanks, (ii) to provide the Siloxirane coating, (iii) to overview the Siloxirane's application to the Joran's cargo tanks, and (iv) to cure of the tank surfaces.

54.    Cantiere agreed to oversee the surface preparation and bore "full responsibility" for ensuring that the Siloxirane coating complied with APS-GATT's technical specifications.

55.    At great costs, the Owners removed and replaced the Joran's twelve stainless steel tanks and replaced them with eight mild steel tanks to be coated with Siloxirane.

56.    The Siloxirane coating did not perform as promised.

57.    The Siloxirane coating suffered from pinholes, cracks, and bubbling.

58.    The Siloxirane coating also damaged the cargo tanks and the fiberglass linings attached to the coating on the bottom and lower portions of the tanks.

59.    Notwithstanding these problems and the Defendants' knowledge of them, on September 28, 1998, APS-GATT issued a certificate stating that they had supervised and approved the surface preparation of the cargo tanks and the application and curing of the Siloxirane and fiberglass coating.

60.    APS-GATT further certified that the cargo tanks were suitable to transport corrosive and toxic chemical cargos.

61.    However, after the Joran carried several cargoes of sulfuric acid caustic soda, the Owners learned on February 12, 1999 that the fiberglass of many of the cargo tanks in the Joran had cracked and lifted, and significant residues of toxic chemicals had leaked from the tanks.

62.    APS-GATT and Cantiere refused to repair the damage to the Joran.

63.    After unsuccessful attempts to repair the Siloxirane coating, the Owners were forced to grit-blast all Siloxirane from the Joran's cargo tanks and then recoat them with a different surface coating .

8

64.    To date Owners have suffered more than $5,702,157 in damages caused by APS-GATT conduct.

## THE OWNERS OBTAIN AN
## ARBITRATION AWARD AGAINST APS AND GATT

65.    Pursuant to the arbitration clause in the Agreement, the Owners commenced Arbitration proceedings in London on December 18, 2001 (the "Arbitration Proceedings").

66.    GATT claimed that it had ceased doing business and therefore refused to make submissions to the arbitral tribunal despite the tribunal's repeated invitations to do so.

67.    In its submissions to the duly convened arbitral tribunal APS admitted that the Siloxirane coating had failed.

68.    APS alleged that it was not liable for any damages because all work on the Joran had been carried out under a separate, oral agreement which had transferred all responsibility for the preparation and coating of the cargo tanks with Siloxirane to the Owners.

69.    Squarely rejecting these arguments the Arbitrator issued interim decisions finding that no oral agreement had been made, that he had jurisdiction to resolve the dispute and that, contrary to the representations of the Arbitration Defendants, the Siloxirane coating had not performed as promised.

70.    The Arbitrator further found that all possible causes of the failure of the Siloxirane coating, including the application of the coating, fiberglass and the heat curing, had been the responsibility of the Arbitration Defendants.

71.    On November 11, 2005, the Arbitrator issued a final quantum award (the "Arbitration Award") finding, APS, GATT and CNS jointly and severally liable and awarding Jilmar that the following:

A.  US $1,800,630.00 for the costs of conversion and recoating of the Joran's cargo tanks to carry corrosive and toxic cargoes, with interest thereon at the rate of 6.1 % per annum, from April 15, 1998;

B.  US $892,556.00 for the costs of conversion and recoating of the Joran's cargo tanks to carry corrosive and toxic cargoes, with interest thereon at the rate of 5.9% per annum, from November 12, 1998;

C.  Italian Lira 144,973,670 for the costs of subsequent repairs following failure of the coating provided and applied by APS, with interest thereon at the rate of 5.7% per annum, from July 10, 1999;

D.  DM 331,999.98, plus US $55,333.33 for damages equivalent to the loss of the hire of the Joran while she was undergoing repair, with interest thereon at the rate of 5.7% per annum, from July 10, 1999;

E.  The Contractors' and Owners' costs of the arbitration reference in full, including (i) the Arbitrator's fees; (ii) the Owners' attorneys fees and expenses; and (iii) the Owners' costs,  with interest thereon at the rate of 6.5% per annum, from November 11, 2005;

G.  Interest on all of the above to be compounded at three monthly intervals, from the specified date above until the date of payment of the Arbitration Award.

72.     As of the filing of this Complaint, damages computed under the Arbitration Award total $5,702,157.00.

73.     Neither APS, APC nor the Keehans have paid any of the Arbitration Award.

74.     In order to enforce the Arbitration Award, Plaintiff commenced a related action in this Court on June 25, 2008 against APS to domesticate the Arbitration Award and have it entered as a judgment.

**THE KEEHANS TRANSFER APS' ASSETS TO APC TO EVADE THEIR CREDITORS THROUGH A SERIES OF FRAUDULENT TRANSFERS**

**APS is Declared Insolvent.**

75.     As noted above, APS was engaged in the manufacture and sale of Siloxirane coatings.

76.     APS' working capital was funded by lines of credit provided by Bank One, N.A. ("Bank One").

77.     During 2000, Bank One loaned to APS in excess of $2,000,000 in exchange for, *inter alia*, promissory notes on behalf of APS and in favor of Bank One.

78.     These promissory notes were secured by the Keehans' personal guarantees.

79.     The promissory notes contained cognovit provisions permitting Bank One to enter judgment against both APS and the Keehans upon APS' default.

80.     APS subsequently defaulted on the promissory notes.

81.     As a result, on November 26, 2002, Bank One entered a confession of judgment in the Court of Common Pleas, Lorrain County, Ohio, against APS and the Keehans in the amount of $2,037,137.98, plus costs (the "Bank One Judgment").

82.     In and around the time that the cognovit judgment was entered, APS had been named as a defendant in several lawsuits in the Court of Common Pleas by diverse creditors.

83.     Faced with liability to the Owners due for the damage to the Joran, the Bank One debt and other its actual and contingent liabilities, APS was unable to pay its debts as they became due and/or the sum of APS' debts were greater than all of APS' assets, at a fair valuation.

**The Transfer of APS' Assets to APC.**

84.     Faced with the obvious liability to Owners and these mounting debts to banks, trade creditors and judgment creditors, the Keehans hatched and brilliantly executed a scheme to transfer all of APS' assets to APC and other Keehan Companies in order to evade their creditors.

85.     This scheme was affected by continuing the operation of APS under the name of another Keehan-controlled entity, APC, which was and is the mere alter ego of APS, Donald Keehan and Arlene Keehan.

86.     On October 20, 1997, less than three months after APS commenced the botched work on the Joran, the Keehans formed APC LLC, a Delaware limited liability company.

87.     On or about January 28, 1998, less than six months after APS commenced the botched work on the Joran, Denise Keehan, the Keehans' daughter and former Vice-President of APS, filed an application with the Ohio Secretary of State to permit APC Ltd. to do business in Ohio as a foreign corporation.

88.     The Keehans stated in the application that APC Ltd.'s corporate purpose would be – "Sales and Manufacture of Industrial Coating Products", the same corporate purpose as the insolvent APS.

89.     APC Ltd. stated in its application that it intended to commence business as soon as possible, *i.e.,* upon approval of the application.

90.     In or around the time Owners initiated the Arbitration Proceedings, APC purported to purchase substantially all of the assets of APS.

91.     Thereafter, APC began utilizing the manufacturing assets of APS.

92.     Keehan Sr. and Mrs. Keehan, as officers and/or directors of APS, were aware of the dispute with Owners and approved the sale of APS assets to APC and consented on behalf of APS to the use of APS assets by APC.

93.     On information and belief such sale or use was for less than adequate consideration.

94.     On November 26, 2002, the very same day that Bank One filed its complaint and cognovits judgment against APS, the Keehans filed a certificate with the Delaware Secretary of State that changed the name of APC LLC to APC Ltd.

95.     On September 22, 2003, the Keehans filed a certificate purporting to dissolve APC LLC in Ohio, effective as of November 22, 2002, or the day before Bank One filed its cognovit judgment against APS.

**APC Purchases APS' Assets.**

96.     Upon Bank One's motion, the Court of Common Pleas appointed Thomas A. St. Marie as receiver for APS (the "Receiver") on January 1, 2003.

97.     The Receiver subsequently inspected the assets located at 951 Jaycox Road, Avon, Ohio the address at which APS conducted business.

98.     The Receiver reported to the Court of Common Pleas that APC Ltd. had claimed ownership in some of the property located at 951 Jaycox Road.

99.     On or about January 28, 2003, Manos advised the Receiver in writing that APS was "not a going concern"; that APS was "aware that Don Keehan was filing for patents in his own name" despite his employment by APS and that Mrs. Keehan, on behalf of APS "either gave away or agreed not to assert any interest in the invention of Don Keehan."

100.    In the same Manos letter referred to in ¶ 99, Manos confirmed APS' 2001 asset sale to APC and APC's use of APS' manufacturing assets.

101.    At a status conference on October 24, 2003, APC Ltd. offered to purchase all of the remaining and tangible assets of APS for $500,000.

102.    The Keehans also offered to purchase all of APS' intangible assets for $100,000.

103.    On February 6, 2004, the Court of Common Pleas approved the sale of the assets of APS to APC and the Keehans for those amounts, such sums to be held in trust by the receiver for payment of the Bank One debt.

**The Keehans Transfer Their Interest in APS'**
**Manufacturing Facilities of to Another LLC to Evade Their Creditors**

104.    Less than four months after Owners commenced the Arbitration Proceedings, on March 28, 2002, the Keehans formed a limited liability company, 951 Realty Ltd. ("951 Realty"), and thereafter transferred their interests in APS/APC's manufacturing facilities at 951 Jaycox Road to 951 Realty.

105.    APC currently leases the 951 Jaycox Road property from 951 Realty, of which the Keehans are managing members.

**The Keehans Form Other LLCs in Their Continuing Scheme to Evade Creditors**

106.    Less than three months after Owners commenced the Arbitration Proceedings, on February 15, 2002, the Defendants formed Acscus Technologies, Ltd. ("Acscus"). The stated purpose of the company was the research, development and marketing of advanced material composite structures.

107.    Manos, attorney for the Keehans and APS, and agent for service of process of APC, was listed as a majority member and agent for service of process of Acscus.

108.    Manos was and is also President of Acscus.

109.    On May 15, 2002, Manos filed a certificate of name change with the Ohio Secretary of State altering the spelling from "Acscus Technologies Ltd" to "Ascus Technologies Ltd."

**APC Experiences Rapid Sales Growth.**

110.    APC markets Siloxirane as its own proprietary technology.

111.    APC publicizes on its website that it is rapidly expanding and successful company.

112.    Indeed, in recent press releases on its website APC proclaims:

(a)    From 1994 through 2002, an average of four ships a year were coated with Siloxirane;

(b)    The numbers of ships coated with Siloxirane doubled in 2003, 2004 and 2005;

(c)    As of June 26, 2007, 121 ships had contracted to receive the Siloxirane coating and 101 ships had already been contracted for 2008;

(d)    APC has entered into a contract with A.P. Moller-Maersk, the world's largest ship owner, to coat nine tanker ships with Siloxirane; and

(e)    APC has made big strides into the Korean shipbuilding market, having signed contracts with Samho Shipping, Stolt-Sinochem, Tesma Singapore Pte., Eitzen Chemical, Sekwang Shipping Co., Ltd. and Daelim H&I Co. Ltd.

113.    At various times since 2002, APC has listed at least two dozen Fortune 500 companies as customers.

114.    To date, according to APC at least 250 ships have been coated with Siloxirane.

115.    APC has also expanded APS' business to include customers in Europe, Mexico, Turkey and China.

116.    According to APC's website advertisement, APC's historical business as successor and alter ego to APS has been expanding continuously since 1994 and in recent years, with seemingly exponential sales growth.  Notwithstanding this success, the Keehans and APC as APS' successor and alter ego have thus far been able to insulate themselves from their historical creditors and unjustly escape their liability for their debts.

117.    The entire Keehan Companies empire is built upon assets that belonged to APS that were deliberately stripped so as to deprive Plaintiff and others of their ability to be repaid.

## THE KEEHANS PURCHASE A HOMESTEAD MANSION IN FLORIDA

118.    In order to further insulate their assets from creditors, the Keehans purchased properties in Florida, a homestead state, during the time of APS' insolvency.

119.    Upon information and belief, on May 9, 2005, the Keehans sold their first residence in Fort Myers, Florida.

120.    Upon information and belief, on May 18, 2005, the Keehans purchased a new residence at 18990 Knoll Landing Drive, Fort Myers, Florida, for $1,720,000 (the "Knoll Landing Property")

121.    As of June 25, 2008, the real estate website Zillow.com did not include the purchase price in its estimate of the Knoll Landing Property's current value because it considers the price to be an "anomaly."

122.    Zillow states on its website that among the reasons that it may concludes that property data is an anomaly include the following:

[U]nusual document or transaction types, sales between possibly related parties, unusually high or low transaction prices, or other data irregularities that might indicate the transaction is not a full-value, arms-length transaction.

## THE KEEHAN COMPANIES ARE ALL
## ALTER-EGOS OF ONE ANOTHER AND OF THE KEEHANS

123.    Upon information and belief, and at all times relevant to this complaint, the Keehans have operated the Defendants and the other Keehan Companies as a single corporate enterprise, without regards to corporate formalities, as evidenced by the following:

(a)    APS, APC LLC, APC Ltd, GATT, all engaged in same business, the manufacture and sale and application of Siloxirane protective lining systems;

(b)    APS, APC LLC, APC Ltd and GATT all share the same business address, 951 Jaycox Road, Avon, Ohio 44011;

(c)    APS, APC LLC and APC Ltd. all share the same telephone number - (440) 937-6128 - and fax number - (440) 937-5046;

(d)    the Keehan Companies are all beneficially owned by the Keehans; in particular, Arlene Keehan is the sole shareholder of APS;

(e)    Arlene Keehan is also president of both APS and GATT;

(f)    Donald Keehan is the owner and agent of 951 Realty;

(g)    Donald Keehan and Arlene Keehan are the managing members of 951 Realty;

(h)    Defendant 951 Realty is the holding company for the property where APC currently manufactures Siloxirane;

(i)    the Keehans daughter, Denise, was/is Vice-President and a Director of APS;

(j)    the membership interests of APC are divided among the Keehans and their six children;

(k)    each of the Keehans' six children has at one time or another worked for the Keehan-related entities;

(l)    John Manos is the agent for service of process for APC LLC, APC Ltd, GATT and Ascus;

(m)    Manos, in his capacity as agent for APC LLC and GATT, lists the same address for APS, APC and GATT - 951 Jaycox Road, Avon, Ohio, 44011;

(n)    Manos, in his capacity as agent for APC Ltd and Ascus, lists his address as 739 East 140 Street, Cleveland, Ohio, which is the same address as Manos' Cleveland law firm; and

(o)    Manos, the Keehans' long-time attorney, has also represented APS, APC LLC, APC Ltd and GATT, sometimes concurrently, as both plaintiffs and/or defendants, in several lawsuits in state and federal courts.

124.    In entering into the Agreement with Owners, the Keehans treated APS and GATT as a single entity.

125.    APS and GATT were defined as a single, inseparable identity; they had identical obligations under the contract, and Arlene Keehan signed on behalf of both APS and GATT.

126.    Since the purported transfer of assets to APC from APS, APC has registered at least three trademarks for Siloxirane related products ChairLine®, MarineLine®, PowerLine®, each of which is utilized in lines of business belonging to APS.

127.    Although APS' registration status in its state of incorporation, Delaware, is currently listed as "Void", it is "Active" in Ohio and APS is currently listed in websites for and yellowpages.com, superpages.com and switchboard.com as located at 951 Jaycox Road, Tel. (440) 937-6218.

128.    In addition, clicking on the company link provided by those websites - http://www.yellowpages.com/name/Avon-OH/advanced-polymer - leads one to APC's website.

## WASTE OF ASSETS AND TRANSFERS OF ASSETS

129.    Upon information and belief, Donald Keehan developed the technology which underlies the original patent for Siloxirane while employed by APS.

130.    The Keehan Companies utilize and rely upon Siloxirane technology pursuant to agreements and/or informal understandings among them.

131.    The website of the United States Office of Patent and Trademarks shows that Siloxirane patent numbers 5,026,816 and 5,169,012 expired in 2003 and 2005, respectively, due to the Defendants' failure to pay registration fees.

132.    Had the registration fees been paid, the patents would have been valid until 2011 and 2012, respectively.

133.    Failure to pay registration fees constituted a waste of corporate assets and deprived creditors of Defendants, including Owners, of potential realizable value.

134.    According to filings made at the World Trade Office, in or around 2004 and while the Arbitration Proceeding were still pending against APS and GATT or 2005 GATT Int'l transferred two patents owned by GATT Int'l, numbers 6,167,827 and 6,267,069 and which concern composite tanks for storing and/or transporting liquid organic and inorganic chemicals, to Ascus, who is also indentified as co-inventor of the tanks.

135. Transfer of such patents deprived Keehan Companies creditors, including Plaintiffs, of potential realizable value.

## CLAIM I

### Declaratory Relief - Alter Ego - All Defendants

136. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 135 as though fully set forth herein.

137. The Keehans operated the Keehan Companies as a single economic entity.

138. The primary business purpose of all of the Keehan Companies was the manufacture and sale of Siloxirane and related products and services.

139. The Keehan Companies had substantially overlapping, if not functionally identical, management.

140. The Keehan Companies had substantially similar operations, used the same equipment and had the same customers.

141. The Keehans were beneficial owners of substantially all of the Keehan Companies.

142. The Keehans used the network of Keehan Companies to defraud their legitimate creditors, including Owners.

143. It would be unfair and unjust to permit the Keehans to abuse the corporate form for the personal benefit and to the benefit of the legitimate creditors of the Keehans and the Keehan Companies.

144. Plaintiff is therefore entitled to a declaration that the Keehan Companies are the alter egos of one another and also of the Keehans themselves.

## CLAIM II

### Declaratory Relief – De Facto Merger – APS, APC

145.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 144 as though fully set forth herein.

146.    During 2001-2004 APS transferred substantially all of its assets to APC.

147.    After the transfer, APC continued the business enterprise of APS.

148.    After the transfer, APC continued to develop, register and exploit technology developed by APS.

149.    After the transfer, there was a continuity of management, personnel, physical location, assets, and general business operations between APS and APC.

150.    There was a continuity of ownership among the two companies in that the Keehans were the beneficial owners of both APS and APC.

151.    After the transfers, APS effectively ceased its ordinary business operations, but never filed for bankruptcy nor ever underwent a corporate dissolution.

152.    After the transfer APC effectively assumed APS' operations and obligations.

153.    Thus, Plaintiff is entitled to a declaration that the transfer of assets from APS to APC resulted in a de facto merger of the two companies, pursuant to which APC assumed the liabilities of APS.

## CLAIM III

### Declaratory Relief – Mere Continuation – APS, APC

154.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 153 as though fully set forth herein.

155.    The Keehans are the beneficial owners of APS and APC.

156.    After the transfer of substantially all of APS' assets to APC, the latter continued APS' business enterprise, as evidenced by the fact that the APC continued to sell and manufacture the same or similar Siloxirane products and related services as APS.

157.    APC also and used the same address, personnel, telephone and fax numbers as APS.

158.    Both APS and APC were managed by the Keehans.

159.    APC took over APS' business operation and continued to target marine application of Siloxirane.

160.    Finally, APC has assumed the obligations ordinarily necessary for the uninterrupted continuation of normal business operations of APS.

161.    APC is the same legal entity as APS, but operating under a different name.

162.    Therefore, Plaintiff is entitled to a declaration that APC is the mere continuation of, and successor in interest to, APS and, thus, is responsible for APS' liabilities.

## CLAIM IV

### Waste and Breach of Fiduciary Duty – Donald Keehan and Arlene Keehan

163.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 162 as though fully set forth herein.

164.    As the directors, officers and/or shareholders of the Keehan Companies, the Keehans had a duty to preserve the assets of the Keehan Companies for the benefit of the Debtors' creditors, including Plaintiff.

165.    Instead of preserving the assets of the Keehan Companies, the Keehans deliberately engaged in a campaign of wasting corporate assets, including but not limited to

patents associated with the Siloxirane technology, and composite tanks, so as to defraud the creditors of the Keehan Companies.

166.    The Keehan Companies' waste of assets included, but was not limited to, allowing control over technology to pass to related entities without adequate consideration, allowing valuable patents to expire due to simple failure to pay registration fees, the transfer of patents to other Keehan Companies to evade creditors, and use of mortgage proceeds on Keehan Companies to purchase homestead property in Florida in an attempts to render themselves "judgment proof".

167.    The consideration received for the above transactions was so disproportionately small as to lie beyond the range at which reasonable officers, directors or shareholders would be willing to trade.

168.    It would have been futile for Plaintiff, a known creditor of the Debtor, to have made a demand on the Keehans to bring actions against the very companies of which they were officers, directors and shareholders, and which they used to defraud their creditors.

169.    The Keehans' wasting of Keehan Company assets has harmed Plaintiff by precluding the satisfaction of the amounts due Plaintiff under the Agreement and/or pursuant to the Arbitration Award.

170.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial.

## CLAIM V

### Fraudulent Transfer – The Keehans and Keehan Companies

171.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 170 as though fully set forth herein.

172.    The Keehans and the Keehan Companies, singly and as alter egos of one another, transferred assets to insiders of the Keehans and the Keehan Companies and undertook obligations such as mortgages with the actual intent to hinder, delay and defraud Plaintiff.

173.    The Keehan Companies singly and as alter egos did not receive reasonably equivalent value in exchange for the transfers or obligations.

174.    The Defendants and Keehan Companies singly and as alter egos of each other intended to incur, or believed or reasonably should have believed that they would incur debts beyond their ability to pay as they became due and/or the Keehan companies were insolvent at the time of the transfers or became insolvent as a result of the transfers.

175.    The Defendants and the Keehan Companies singly and as alter ego of each other intended to hinder or delay Owners' ability to satisfy the debt due to them by transferring assets from APS to APC and the subsequent use of APS assets by APC and the other Keehan Companies.

176.    The failure to renew patent registration and subsequent use by other Keehan Companies constituted a transfer of assets by APS and/or the Keehans.

177.    The transfer of patents by GATT and subsequent use by other Keehan companies constituted a transfer of assets by GATT and/or the Keehans.

178.    At all times Keehan Sr. and Mrs. Keehan retained control of the transferred technology and other transferred assets.

179.    Despite the fact Keehan Companies were in fact insolvent or rendered insolvent by these transfers, neither the Keehans nor the Keehan Companies revealed these transfers to Owners.

180.    At the time of each transfer the Arbitration Proceedings were pending or an award had been entered against one or more Keehan Companies.

181.    Substantial additional debts were incurred by APS after commencement of the Arbitration Proceedings.

182.    All of the transfers by APS to APC and the other Keehan Companies have harmed Plaintiff and were intended by Defendants to hinder or delay Owners' recovery of their debt by preventing the satisfaction of the amounts due Plaintiff under the Agreement and/or pursuant to the Arbitration Award.

183.    All such transfers constitute fraudulent transfers within the meaning of § 1304, Delaware Statute.

184.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial.

WHEREFORE, Petitioner Marnavi, as agent for Jilmar, respectfully requests that this Court enter a Judgment:

I.    As to Counts I, II and III declare that the Defendants and the other Keehan Companies are alter egos of APS and/or the Keehans and are liable for the debts of APS;

II.    As to Count IV awarding damages jointly and severally against all Defendants, including the Keehan Companies as their alter egos in an amount to be determined at trial, but not less than $5,702,157.00;

III.    As to Count V, award damages jointly and severally against all Defendants, including the Keehan Companies as their alter egos for an amount to be determined at trial, but not less than $5,702,157.00;

IV.     As to all counts awarding, jointly and severally against all Defendants and the Keehan Companies prejudgment, interest on all of the above items;

V.     As to all Counts awarding, jointly and severally against all Defendants, including the Keehan Companies as their alter egos, interest at the federal judgment rate as set forth in 18 U.S.C. § 3612(f)(2) from the date of judgment by this Court payment in full of the judgment;

VI.     As to Count V awarding jointly and severally against all Defendants including the Keehan Companies as their alter egos, costs, including attorneys' fees, in this proceeding; and

VII.     As to all Counts, awarding such other and further relief as the Court may deem to be just and proper.


Dated: June 25, 2008                              **DUANE MORRIS LLP**


                                                  /s/ Frederick B. Rosner
                                                  Frederick B. Rosner (DE # 3995)
                                                  Matt Neiderman (DE # 4018)
                                                  1100 North Market Street
                                                  Suite 1200
                                                  Wilmington, DE 19081-1246
                                                  (302) 657-4900

                                                  - and -

OF COUNSEL:

**SALANS**

Claude D. Montgomery, Esq.
Paul C. Gunther, Esq.
620 Fifth Avenue
Rockefeller Center
New York, New York 10020
212-632-5500

*Attorneys for Marnavi, SpA as agent for
Jilmar Shipping S.A.*

The JS-44 civil cover sheet and information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Marnavi, SpA, as agent for Jilmar Shipping, S.A.

**DEFENDANTS**

Advanced Polymer Sciences, Inc., Advanced Polymer Coatings, Ltd. f/k/a Advanced Polymer Coatings, LLC, Donald J. Keehan and Arlene H. Keehan

**(b)** County of Residence of First Listed Plaintiff Italy
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Frederick Rosner, Esq., (I.D. #3995) Duane Morris LLP
1100 North Market Street, Suite 1200, Wilm., DE 19801
(302) 657-4900

Attorneys (If Known)
Unknown

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC/Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | Act |
| | | | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | | ☐ 870 Taxes (U.S. Plaintiff | Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 900 Appeal of Fee |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | ☐ 871 IRS–Third party | Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | Under Equal Access to |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | Security Act | | Justice Act |
| | | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of |
| | | ☐ 555 Prison Conditions | | | State Statutes |
| | | | | | ☒ 890 Other Statutory Actions |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.) 28 U.S.C. § 1332

Action in support of its related petition to enforce a foreign arbitration award, against the defendants and their alter egos.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $5,702,157.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** (See Instructions):
JUDGE Pending

DOCKET NUMBER Pending (Marnavi v. Advanced Polymer Coatings)

DATE: June 25, 2008

SIGNATURE OF ATTORNEY OF RECORD: /s/ Frederick B. Rosner (Del. No. 3995)

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____