1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

    MARNAVI SPA as agent for
4   JILMAR SHIPPING S.A.,                    :
                                             :     CIVIL ACTION
5                Plaintiff,                   :
                                             :
6           v.                               :
                                             :
7   DONALD P. KEEHAN, ARLENE KEEHAN,         :
    ADVANCED POLYMER SCIENCES, ADVANCED      :
8   POLYMER SCIENCES, INC., and             :
    ADVANCED POLYMER COATINGS, LTD.,         :
9                                            :     NO. 08-389-LPS
                 Defendants.
10                             - - -

11                         Wilmington, Delaware
                           Monday, June 27, 2011
12                         *ORAL ARGUMENT HEARING*

13                             - - -

14  BEFORE:          HONORABLE **LEONARD P. STARK**, U.S.D.C.J.

15                             - - -

    APPEARANCES:
16

17

                   SMITH, KATZENSTEIN & FURLOW
18                 BY:  LAURENCE CRONIN, ESQ.

19                     and

20                 STORCH AMINI & MUNVES, P.C.
                   BY:  BIJAN AMINI, ESQ.
21                     (New York, New York)

22                         Counsel for Plaintiff

23

24
                                   Brian P. Gaffigan
25                                 Registered Merit Reporter

```
 1    APPEARANCES:  (Continued)

 2

 3              BOUCHARD, MARGULES & FRIEDLANDER, P.A.
              BY:  JOEL E. FRIEDLANDER, ESQ., and
 4                 SEAN BRENNECKE, ESQ.

 5                      Counsel for Individual Defendants

 6

 7              CROSS & SIMON, LLC
              BY:  TARA M. DiROCCO, ESQ.

 8                 and

 9              JOHN M. MANOS CO. LPA
              BY:  JOHN M. MANOS, ESQ.
10                 (Cleveland, Ohio)

11                      Counsel for Advanced Polymer Coatings

12

13

14

15

16

17                      - oOo -

18                 P R O C E E D I N G S

19              (REPORTER'S NOTE:  The following oral arguments

20    were held in open court, beginning at 1:01 p.m.)

21              THE COURT:  Good afternoon, everyone.

22              (The attorneys respond, "Good afternoon, your

23    Honor.")

24              THE COURT:  Let's begin by putting your

25    appearances on the record.
```

1              MR. CRONIN:  Laurence Cronin on behalf of the

2    plaintiff.  With me is Bijan Amini and his paralegal, Tamir

3    Greenberg.

4              THE COURT:  Welcome to you.

5              MR. AMINI:  Thank you, your Honor.

6              MR. FRIEDLANDER:  Good morning, judge.

7              THE COURT:  Good morning.

8              MR. FRIEDLANDER:  Joel Friedlander.

9              THE COURT:  Good afternoon.

10             MR. FRIEDLANDER:  Good afternoon.  I'm sorry.

11   Joel Friedlander.  I'm representing Donald Keehan and Arlene

12   Keehan.  With me are my co-counsel, John Manos, Tara

13   DiRocco, and my associate Sean Brennecke.  And Mr. Keehan is

14   here as well.

15             THE COURT:  Let's talk for a minute about how

16   we're going to proceed.  Have you all conferred about how

17   you would like to do that?

18             MR. FRIEDLANDER:  Well, we have not conferred,

19   but I would hope it would be relatively straightforward.

20   The motions are all on our side of the ledger, so I think we

21   should just go first, and we'll see how your Honor has

22   allocated the time.

23             THE COURT:  Did you intend to argue all three of

24   the motions or is co-counsel as well?

25             MR. FRIEDLANDER:  I'm going to argue on behalf

1    of the Keehans.  Mr. Manos will argue on behalf of APC.

2              THE COURT:  Well, then we will hear from you and

3    Mr. Manos.  Then we will give plaintiff a chance to respond

4    to all the motions.  Then we'll give the defense a final

5    word on the motions.  As you are the moving parties, you may

6    proceed.

7              MR. FRIEDLANDER:  Very good.  Thank you, your

8    Honor.

9              On behalf of the Keehans, we're here on two

10   motions, which is a motion to dismiss, and a motion for

11   summary judgment.  They're somewhat related in that there is

12   a jurisdictional motion on behalf of the Keehans, and the

13   jurisdictional motion is tied to certain motions to dismiss

14   on the merits, the breach of fiduciary duty claim.  That is

15   because the two bases argued for with jurisdiction would be

16   the director consent statute 3114 and the long-arm statute,

17   3104.

18             So taking 3114 first, there are three independent

19   reasons why the complaint doesn't state a claim for breach of

20   fiduciary duty or, alternatively, why judgment should be

21   issued on that claim as a matter of summary judgment.  That

22   is, the lack of capacity of APS under Section 278 of the

23   Delaware Code, the statute of limitations under just ordinary

24   breach of fiduciary duty principles as well as the lack of

25   standing due to the receivership in Ohio and the sale of

1   claims through the Ohio court system.  So for those three

2   reasons.  I'll get to them in greater length obviously.

3                I think there is no breach of fiduciary duty

4   claim and, therefore, no 3114 jurisdiction.

5                Then we argue there is no 3104 jurisdiction

6   because there is no act in Delaware integral to the

7   complaint.  So the composite of any of the arguments as to

8   3114 and the arguments to 3104 would be dispositive as to

9   the Keehans completely as a matter of personal jurisdiction.

10               Additionally, there are other grounds for

11  dismissal of the statute of limitations as it relates to the

12  fraudulent conveyance claim, and also we argue that there is

13  no actionable claim for alter-ego liability.

14               So, essentially, I have listed six different

15  arguments.  I'll just proceed to take them in order.

16               As to Section 278, this is a strict rule under

17  the corporate law that APS's corporate existence, its

18  capacity to sue or be sued, elapsed three years after the

19  date its charter was voided for nonpayment of taxes.  So

20  that takes you from March 1, 2004 to March 1, 2007, and

21  this action wasn't filed until late June 2008.

22               The lawsuit necessarily implicates Section 278

23  because a breach of fiduciary duty claim is a suit against

24  APS as a nominal defendant, and it's a suit on behalf of APS

25  as a plaintiff.  So I think on either side of the ledger,

1    278 is implicated.

2            The case law in applying the statutes, which are

3    both pretty clear, that Section 278 cannot be extended after

4    the three years have already elapsed.  There is a discretion

5    by a Court during the three-year period to extend it but not

6    after the three-year period has expired.

7            THE COURT:  You referenced the March 1st, 2004

8    date.  Does the record show the State of Delaware actually

9    doing something on that date?

10           MR. FRIEDLANDER:  Yes.  And that's in the

11   Brennecke affidavit, Exhibit CC, which is DI 155, and that

12   is the date as reflected on the records of the Delaware

13   Secretary of State.  It's a certified copy of the charter of

14   the statement saying the aforesaid corporation is no longer

15   in existence and good standing under the laws of the State

16   of Delaware, having become inoperative and void, the first

17   day of March A.D. 2004 for nonpayment of taxes.

18           THE COURT:  And that would have been a publicly

19   available document, wouldn't it?

20           MR. FRIEDLANDER:  Absolutely.

21           So under the case law, interpreting 278 under

22   the language of 278 itself, no new suits after three years

23   and no extension of the three-year period.  In Re: Dow is

24   one case we cited, the Delaware Chancery Court in 2008, one

25   of the more recent ones in that area.  There is also a

1    federal decision in <u>Eicher v Dover Industries</u>, in the

2    Western District of Pennsylvania, in 2009, as well as other

3    authorities, all uniform on those two propositions, no new

4    suits after three years and you can't extend the three-year

5    period after the three years have elapsed.

6         The law is also very strongly in favor of the idea

7    that when Section 278 refers to a company being other otherwise

8    dissolved, that includes becoming void for nonpayment of

9    taxes.  That's <u>City Investing v Continental Casualty</u>, the

10   Delaware Supreme Court in 1993, which state Section 278 and

11   Section 279 apply "whether a corporation is dissolved

12   voluntarily by shareholders or for nonpayment of taxes."

13        Judge Latchum, in 1987, in <u>U.S. v McDonald & Eide</u>

14   specifically held, as a matter of law, the corporation did not

15   exist after it was dissolved by gubernatorial proclamation

16   because of the nonpayment of taxes.  Once the three years

17   passed, the corporation reached the end of its corporate life

18   cycle and seized to exist.

19        We cited the Drexler treatise, and the Wolfe &

20   Pittenger treatise, both discussing the law equates

21   nonpayment of taxes for inactive voluntary dissolution under

22   Section 275, both of which are applicable under 278.

23        The other side has cited a couple of cases  they

24   say suggest the contrary.  One is the <u>Krapf</u> case, K-r-a-p-f,

25   in 1968.  But that was done with a completely separate

1    question of whether a corporate officer was liable during an

2    interim period when the corporation went void and then it

3    reinstated its charter, and it talked about how statutes

4    create a remedy against the corporation to deal with

5    creditor claims against the corporation and there was no

6    liability on the corporate contract.  But this is not --

7    we're not in revocation.  We're not in a resuscitation of

8    the charter situation here.

9              And they cite a case from 1964 where this court

10   felt bound by a Delaware Superior Court decision from 1942,

11   and that's getting pretty dated, but authorities I cited are

12   far more recent than that.  And also, the Court back in

13   1964 said it felt bound by the questionable construction of

14   Section 278 that the Delaware Superior Court applied in

15   1942.

16             And then the other issue that was raised as to

17   Section 278 is whether this lawsuit should be deemed a

18   continuation of the arbitration proceeding.  The statute

19   speaks pretty directly to this, the last sentence of Section

20   278.  I should read the whole sentence and try to emphasize

21   the key words, because it refers to then pending litigation.

22   So it says:

23             "With respect to any actions, suit or proceeding

24   begun, buyer against the corporation, either prior to or

25   within three years after the date of its expiration or

1    dissolution, the action shall not abate by reason of the

2    dissolution of the corporation.  The corporation shall,

3    solely for the purpose of such action, suit or proceeding,

4    be continued as a body corporate beyond the three-year

5    period until any judgments, orders or decrees therein shall

6    be fully executed without any special direction to that

7    effect by the Court of Chancery."

8              So what it is referring to allowing a pending

9    litigation to reach its conclusion.

10             This case, we've put the pleading into the

11   record what was being litigated in the arbitration.

12   Basically, this contract commercial dispute.  Here, of

13   course, we have a case, there was a companion action filed

14   at the same time this one was to enter a foreign judgment

15   from the arbitration, get that recognized here.

16             This case is not connected in any way to the

17   arbitration.  It is a purported derivative lawsuit with

18   fraudulent conveyance claims based on a whole other series

19   of facts that are years after the facts at issue in the

20   arbitration with new claims seeking relief on behalf of the

21   company -- the company that was being sued in the foreign

22   arbitration.

23             The case -- there is basically one decision

24   interpreting Section 278 by the Third Circuit dating back to

25   1943, NLRB v Weirton Steel in basically what seemed to be a

1    throwaway argument by a defendant in a labor dispute where

2    there had been apparently a very long process of months long

3    hearings before trial examiner about folks getting fired

4    allegedly in retaliation for union activity for mines, and

5    then that got appealed to the NLRB itself, and the board

6    ordered reinstatement of back pay.  And then within a year of

7    that -- I'm sorry.  And then the corporation appealed that

8    ruling to the Third Circuit and said:  Oh, by the way, we've

9    dissolved in the meantime and that time period elapsed

10   essentially last year.  So they said the three-year period

11   elapsed in 1942.

12          The Third Circuit issued its ruling in 1943 and

13   they just say:  We think that under the Delaware statute,

14   the corporate entity was preserved for the purposes of

15   proceeding before the board, the NLRB, and that this

16   enforcement proceeding is but a continuation of that one.

17          But it's really appellate proceedings through

18   the same case.  The case had been dragging on for years.  So

19   I think that was a pretty clear case and very far, far

20   different than what we have here.

21          What we have here is Marnavi is essentially

22   purporting to function as a self-appointed receiver for the

23   company, to bring claims on behalf of the company by virtue

24   of having sued the company in arbitration on a contract

25   dispute.  There is not even close to an identity of the

1    claims or really can be said to be a continuation of the

2    claims.  It is in a completely different capacity, suing

3    different individuals.

4              THE COURT:  Is that a factual question?  That is,

5    clearly, they're going to get up and say that they are related,

6    maybe not identical but that this action is a continuation as

7    related to the arbitration.  Is that potentially a fact

8    dispute that maybe we need to call a jury in on to decide?

9              MR. FRIEDLANDER:  I don't believe so, your

10   Honor, for two reasons.  One.  Well, it's hard to see how we

11   have a fact dispute.  We have the pleadings about what was

12   litigated in the arbitration, and we have the fact of the

13   companion action that was filed at the same time which was

14   to get judgment entered against APS.

15             THE COURT:  Would you concede that that

16   companion action, which I think they call confirmation

17   action, that that is a continuation of the arbitration?

18             MR. FRIEDLANDER:  I think a good argument can

19   be made for that.  I don't -- I don't feel -- I'd rather

20   not on behalf of the Keehans say it's conceded but I can

21   understand the argument.

22             THE COURT:  That one at least would be closer.

23             MR. FRIEDLANDER:  Yes, but I think that would

24   be akin as to what is being envisioned.  And, by the way,

25   the words of the statute are just -- are pretty clear, I

1    submit.  It's only for the specific action -- the action,

2    such action, any judgments therein, with respect to any

3    action.  So it's not -- I just don't think you are allowed

4    to say it's related to the action or similar to the action

5    or grew out of things that we chose we wanted to do for

6    tactical reasons because of the prior action.  It's not

7    that -- it's precise words in a statute and a very clear

8    record, really an indisputable record, about what the

9    pleadings were there and what the pleadings are now.  And,

10   frankly, I don't think there is any really -- I don't think

11   there is much dispute about what the law is in this area

12   either.

13              THE COURT:  What if your reading to the statute

14   leads to an inequitable outcome?  Does equity factor in at

15   that point to how you read in the statute?

16              MR. FRIEDLANDER:  No.  The case law is pretty

17   clear about that, too, your Honor, which is that there are

18   two different statutes.  There is 278 and 279, and 279 is to

19   seek the appointment of a receiver.  The law is pretty clear

20   that you can't use 279 as an end-run around 278 but that 278

21   is a statutory defined period of repose.

22              There has really been quite a lot of litigation

23   under 278, and to say it's not -- it really was actually

24   meant to eliminate judicial discretion for claims against

25   corporations.  The common law rule used to be that all cases

1    terminated upon the corporation law capacity upon dissolution.

2    And then if you go back a long time, there was something

3    called the trust fund doctrine, which was a judicial rule

4    about when creditors can come and bring claims.  And the

5    uniform interpretation of the statutes has been, there is a

6    statutory scheme now, and 278 just cuts off the claims, and

7    there has been no case saying there is this discretion

8    allowed under 278 that is a direction to courts.

9             And I would direct your attention to -- there

10   is, there is the 22 Wells Litigation, the Virgin Islands

11   litigation also known as the Goldman Sachs Litigation that

12   went up through the Third Circuit, with Judge Stapleton,

13   went up through the Second Circuit, Vice Chancellor Strine

14   had a decision, and then it was affirmed by the Delaware

15   Supreme Court a couple years ago, in coming to this

16   conclusion that 278, really all the courts consistently

17   ruling that 278 is an absolute bar for someone who wants

18   to come up with a claim after the period has lapsed, and

19   Section 279 is a discretionary statute, although there is

20   also direction that 279 is not meant to be used an end-run

21   around 278, but 279 is meant to be used when there are

22   remaining assets left in the corporation, post-dissolution.

23             And here, if I can transition to the second

24   argument, your Honor, which was about the Ohio receivership

25   proceeding.  Here, there are no assets left of the

1   corporation remaining to be administered.

2        By the way, if I can just give you a citation

3   before I get to that, about the lack of an end-run.

4        Well, there are just some of the other cases in

5   this area.  There is In Re:  Dow Chemical.  There is the

6   In Re:  National Medical Properties.  That sort of discusses

7   the special -- and City Investing itself -- the special

8   relationship between Section 278 and 279.

9        But if I can get to talk about what happened in

10  Ohio.  In Ohio, there is an Ohio judgment entered on

11  February 6th, 2004, approving the sale of APS's remaining

12  assets, and there are two separate transactions:  the sale

13  of certain tangible assets to the Keehans, the sale of

14  other assets to APC, and the Keehans' purchase, including

15  the intangible assets, are choses of action of APS, and

16  the terms were found by the Ohio court to be fair and

17  reasonable.

18       We submit that what Marnavi is trying to do,

19  almost sub silencio, is make a collateral attack on the Ohio

20  judgment because under the Ohio judgment, by its plain

21  terms, there are no assets left of APS to administer.  There

22  has already been a receivership proceeding, and they're

23  essentially saying we want to go forward anyway.  But what

24  was sold includes the right to bring a derivative action.

25  The claims of APS, choses of action of APS would include

1    derivative claims, corporate claims.

2            So there is standing to -- any standing they

3    might have had to bring a claim on behalf of the corporation

4    was divested by the court order which transferred the claim

5    to the Keehans.  Thus, there is no more standing to assert

6    it.

7            By analogy, by rough analogy in a rough merger,

8    if there is a merger and the surviving corporation then

9    inherits the derivative claims, the plaintiff no longer has

10   standing to pursue that claim on behalf of the corporation.

11   Even if it's a stock-for-stock merger and you remain the

12   stockholder of the surviving company, your standing has been

13   divested, and that is what happened in the Ohio judgment.

14   The claim was transferred.  Just as if it was assigned or

15   transferred, the corporation merged.

16           The creditor in this case in a derivative

17   capacity lost the validity to assert that claim.  And there

18   are a bunch of reasons why no collateral attack is feasible.

19   And as we noted in our reply brief, all the arguments made

20   by Marnavi except for one are all mushed in one footnote,

21   but the fact that there is only one footnote on the subject

22   I think maybe underscores the importance of the issue

23   because to have a collateral attack on a receivership sale,

24   essentially undo the court order of the Ohio Court of Common

25   Pleas of 2004 requires under 60(b)(6) -- if this is a

1    60(b)(6) motion, it had the "extraordinary circumstances"

2    standard under Budget Blinds, the Third Circuit decision.

3              They also try to analogize this to the

4    Xperex litigation in Chancery Court, but that was very

5    different because that was a foreclosure sale.  So that is

6    when people get together and say we're foreclosing on the

7    properties and there was arguments of collusion between

8    the insiders and the creditor who came in and bought the

9    remaining assets of the company, and Chancellor Chandler

10   talked about:  It smelled bad.  You couldn't get much cover

11   from the foreclosure sale.

12             But this isn't a foreclosure sale, this is a

13   receivership sale.  So what that meant was there was a

14   secured creditor, Bank One, that acted independently in

15   obtaining a confession of judgment.  There is no dispute

16   about that.  They obtained a receiver, the appointment of a

17   receiver.  The independent receiver issued a preliminary

18   report, reported to a Court, made a judgment about what

19   should be done, and the Court oversaw the work of the

20   receiver and approved the transaction on terms that had

21   been worked out essentially at a status conference convened

22   by the Ohio court on October 24th, 2003.

23             This is all apparent from the publicly available

24   judicial records of the Court of Common Pleas, mostly

25   attached as Exhibit BB of the Brennecke affidavit, DI 155-8.

1              THE COURT:  What is in that record as to what,

2     if anything, the Court was told about Marnavi and other

3     unsecured creditors?

4              MR. FRIEDLANDER:  There is a reference in the

5     preliminary report -- I believe it's a preliminary report --

6     talking about other litigation.  There was pending

7     litigation in the United States.  So I think they're -- I

8     wish I could grab the page.  But it's clear the Court was

9     aware of other litigation because there was other pending

10    litigation.

11             Under Ohio law, there is no right to notice.

12    Claimants -- or creditors generally, whether you're a trade

13    creditor or a judgment creditor or claimant in litigation,

14    there is no right to notice of every transaction that

15    happens in a receivership.  It's not like bankruptcy.  They

16    draw the analogy to bankruptcy.  There is not releases of

17    everyone.  There is not a cutting, a divesting of rights.

18             There are sales of property.  And sometimes

19    there is the power, under Ohio law, to sell individual

20    pieces of property free and clear of all liens.  If someone

21    has a lien on a property, they must have notice and an

22    opportunity to be heard.  And we cited the Ohio appellate

23    court decisions on that subject.

24             But here, the person, the only party that had

25    rights and interest in the property was Bank One.  So Bank

1    One was a secured lender, had interests in all the property

2    of APS.  It was informed, and it consented to the

3    transaction, and that satisfies the due process concerns.

4            But as a general proposition, when a receiver

5    sells corporate property, there is no requirement to tell

6    all claimants and creditors, wherever they may be, actual

7    potential, contingent, liquidated, unliquidated, there is no

8    concept of telling the whole world a receiver is going to

9    sell a piece of property of the company.

10           THE COURT:  Your argument is Marnavi did not

11    have any rights that were extinguished about transaction

12    because it's actually a right or an asset of APS that was

13    transferred?

14           MR. FRIEDLANDER:  Yes, sure.  So there were

15    intangible assets transferred.  There were tangible assets

16    transferred, so included in the intangible was choses of

17    action.  And Marnavi, like any other contingent creditor,

18    unliquidated creditor, it stood in no better position or

19    worse position than a general unsecured creditor in terms of

20    the processes of Ohio law.  And there is a fair amount of

21    Ohio law on when you have to give notice and when you don't,

22    and it's basically when someone has a right to a specific

23    property, and the Court, by court order, is saying all liens

24    are extinguished in that property.  But Marnavi had no

25    interest in any particular property of APS that was sold.

1            THE COURT:  Now, stuck within that footnote I

2    think also is the suggestion that a creditor does have

3    standing to bring a claim such as this, and that that would

4    therefore survive the receivership.

5            MR. FRIEDLANDER:  Yes.  Right.  I think we're

6    both citing the same case, which the North American Catholic

7    Educational -- NACEPF v Gheewalla.  I think we're both

8    citing it.  I don't think there is much disagreement about

9    what it holds.

10            Frankly, I think Marnavi is confusing standing

11    with the right to assert the claim; and that is why I was

12    talking about a merger.  Because when the corporation is

13    insolvent, Gheewalla says, the creditors cannot take over

14    the status of stockholders and that they have the right to

15    assert a derivative claim subject to the pleading rules and

16    such of Delaware law.  But because they have a right to

17    asset a derivative claim, because they have standing to

18    assert a derivative claim doesn't mean they have a vested

19    right that prevents the corporation from transferring the

20    claim.  And we see this, frankly, now all the time there are

21    decisions about being in mergers.  Claims gets transferred

22    to other corporations.  Corporations can transfer claims.

23            To give you an example, there is Nagy v Bitricer,

24    a decision by Vice Chancellor Strine, 80-100 page decision

25    that came out last month talking about what the rights of

1    stockholders are and are not when a claim -- when there is

2    an imminent merger and the claims are going to pass to the

3    surviving entity of the merger and surviving company of the

4    merger, but it's treated in Delaware law as an asset of the

5    corporation.  So if you're a stockholder, you are bringing

6    in an appraisal action, you can get a value, you can get the

7    claim valued as part of the appraisal action, but there is

8    no right to continue.  You have no vested right to continue

9    asserting the action or to stop the corporation from

10   transferring the claim, from taking by corporate act or by

11   assignment.

12              I draw right now to Barnes & Noble, a similar

13   situation, where it had a derivative claim about Barnes &

14   Noble and Vice Chancellor Strine indicated in a transcript

15   that, well, maybe the claim should be assigned where the

16   merger takes place so the value can be gathered by the

17   corporation that they acquired of them.  It can bring the

18   claim.

19              The idea is you can assign claims.  They can be

20   transferred by operation of law in a merger.  There is no

21   vested right of a stockholder or creditor to continue to

22   assert the claim notwithstanding what the corporation does.

23              THE COURT:  I don't know that there is any dispute

24   as to what the meaning of the term "choses in action" is, but

25   it appeared you cited Black's Law Dictionary.  Is there no

1    Delaware or Ohio law construing that term?

2           MR. FRIEDLANDER:  I haven't seen it in Delaware.

3    It's a bit of an archaic term, but Black's Law Dictionary

4    says "claim for damages in tort," which sounds right.  And

5    certainly property was transferred.  It's hard to see how

6    there is any property left behind by virtue of the court

7    order and the purchase and sale agreements that were

8    approved by the Ohio Court in 2004.

9           There is a gesture in the same footnote saying

10   you can't -- the court order is no good if it's the product

11   of fraud, but there is not an argument or allegation there

12   is any fraud perpetrated against the Ohio court.

13          That, in fact -- this brings me to my next

14   argument -- just about everything Marnavi was alleging in

15   its complaint was taken from the docket in the receivership

16   proceeding and the preliminary report of the receiver.  So,

17   if I can move to that.

18          That's the statute of limitations argument.

19   Under the normal three-year statute of limitations in Delaware

20   for torts, there is equitable tolling for allegations of

21   self-dealing, but equitable tolling, the law is very clear on

22   this, the tolling stops when the plaintiff is on inquiry

23   notice.  And that is defined in Wal-Mart v AIG, the Delaware

24   Supreme Court as:  Discovery of facts sufficient to put a

25   person of ordinary intelligence and prudence on inquiry,

1    which, if pursued -- if that inquiry were pursued would lead

2    to the discovery of such facts -- referring back to the

3    facts -- constitute the basis of the cause of action.

4              This Court, Judge Farnan, just a year ago, in

5    Norman v Elkin, said, confirmed that publicly available

6    information can form inquiry notice, as can a letter written

7    by a litigation adversary.  That can trigger adversary

8    notice.

9              Here, we have a letter written by a litigation

10   adversary which specifically discusses, identifies the

11   receivership proceedings, giving the docket number, it gives

12   the name of the judge, gives the name of the court, and says

13   what happened was a sale approved the liquidation of all the

14   assets of the corporation to the benefit of the secured

15   creditor, and a wealth of publicly available information

16   that is then ascertainable by APS -- or by Marnavi, I'm

17   sorry, if they were so inclined, if -- I think they have

18   ordinary intelligence, but if they had the prudence and

19   interest to move forward.

20             They had everything they needed to know, because

21   not only did they know all the publicly -- not only could

22   they just look up the docket number and pull the docket off

23   the Internet but they also knew about APS and APC in the

24   marketplace.  And we have put into the record, we have a

25   docket production by Marnavi where for years they had in

1    their own document production articles about APC, articles

2    about APS about what is going on in the industry.

3            And we deposed Mr. Pesce, the representative of

4    Marnavi and asked him what he thought of this letter, the

5    June 28th, 2004 letter, and he referred to it as a "deceiving

6    maneuver."  That's how he interpreted it, as a deceiving

7    maneuver designed to deter Marnavi from proceeding with its

8    arbitration claim.  And I think it's the arbitration claim as

9    against APS.

10           There is a letter saying all the assets of APS

11   have been sold to the benefit of the secured creditor.

12   Mr. Pesce knows from his industry knowledge that Mr. Keehan is

13   running APC and he says:  Looks to me like the same business.

14   Looks to me like the same person is running it.

15           Actually, I'll just quote it from page 79 of his

16   deposition.  DI 155-3, page 79 of his deposition.

17           "But it was absolutely meaningless to us."

18   Referring to the letter.  Then continuing on, "... personally

19   I thought it was a deceiving maneuver just to stop us asking

20   and going ahead.  Because on the other side Donald Keehan

21   was still working ... selling his products so there was

22   continuity there."

23           So when a person of prudence, if you have a

24   claim against APS and you are told that all the assets have

25   been sold to the secured creditor and you know there is an

1   entity APC, there is industry literature about APC out there

2   and you think the same person is running the company, so you

3   think there has been affiliated transaction in some way, you

4   look into it.  That's what it means to be a person of

5   ordinary intelligence and prudence.  And if you do, you

6   discover what they discovered in June 2008 when they finally

7   got around to pulling the docket and reading what it said

8   and writing their complaint.  But for whatever reason, they

9   waited four years to do so.

10          And the law, again, is designed for three years

11  under the equitable tolling.  The judicial policies behind

12  that are essentially to give a period of repose.  Someone

13  can just look up in a newspaper and say one day:  Hey, wow,

14  APC is making a lot of money.  Maybe I should go sue them.

15  I didn't want to take the trouble to do it a year ago, two

16  years ago, three years ago, four years ago, but I think I

17  will just sue them now in 2008 and then dig up a bunch of

18  facts about things that happened in 2001 and say, all right.

19  Here it is in 2008.  I now want to sue about things that

20  happened in 2001 or in 2004 or in points in between or

21  beforehand, and that's what we have here.

22          The law obligates the creditor or, here, the

23  investor, whether it's the secured creditor or shareholder,

24  the person who wants to assert a derivative claim and says

25  there is self-dealing going on, that is what they're saying,

1   to obtain readily available public information and learn if

2   a fraudulent conveyance or breach of fiduciary duty occurred,

3   there is information there to make out a claim.

4          So Exhibits BB, HH, II to the Brennecke

5   affidavit, they all are pieces of the record, of the

6   receivership record that Marnavi pulled.  You can see the

7   date, April 8, 2008.  That's when they pulled the docket.

8   Why they waited four years, I don't know, but they did and

9   by operation of the law and application of the law, that is

10  just too late.

11         So we have a very full record about what

12  happened, why it happened.  That this was perceived to be a

13  deceiving maneuver.  We know what information they had still

14  in their files, and we know what was in the public record.

15         So then they did a whole public search and

16  pulled in documents about APC, about APS.  They pulled

17  patents.  They pulled real estate records.  All the stuff

18  they put in their complaint was public information available

19  to them in 2004.  And they had industry information, and

20  because they had industry information, they thought it was a

21  deceiving maneuver and yet did nothing.

22         So there is no legal support for turning a blind

23  eye to a letter viewed as deceptive and the failure to

24  gather public information specifically identified in that

25  letter, namely, the docket to the receivership, which just

1    so happens is what they're actually suing about.

2              Unlike, they say, Coleman v PricewaterhouseCoopers,

3    which there was no red flag in the single e-mail that issued

4    there; here, it is almost by definition a red flag, and it is

5    perceived to be a red flag, it was admitted to be a red flag.

6    It was admitted, perceived to be a deceiving maneuver.

7              So those are the three reasons why we submit

8    there is no breach of fiduciary duty claim:

9              Lack of capacity to sue or be sued under 278.

10             Statute of limitations and no equitable tolling.

11   So there is only three years.  The three years lapsed in

12   2007.  And,

13             No standing due to the sale of the claim in the

14   receivership.

15             Under Section 3104, the ordinary long-arm

16   statute, the requirement there is pretty clear that you need

17   an act in Delaware, under any theory, whether it's ordinary

18   long-arm jurisdiction, whether it's alter-ego liability,

19   whether it's conspiracy jurisdiction, under any form of

20   specific jurisdiction, unless you have somebody who is

21   continuously doing business in the state, which is obviously

22   a more extreme form of conduct in Delaware.  You need an act

23   in Delaware.

24             If it's the single act statute, you need the

25   single act in Delaware; you can't just say someone is a

1    Delaware entity or you are affiliated with a Delaware

2    entity; and the act in Delaware has to be "integral to the

3    claim."

4            And so what that means, among other things, is

5    the act in Delaware, like the forming of an entity, it

6    cannot be years before the facts of the claim.  It can't be

7    years after.  Because years before, that is just another way

8    of saying, oh, you are a Delaware entity.  You incorporated

9    APS in 1986.  You incorporated APC in 1997.  That just

10   having a Delaware entity on the other side of the caption

11   doesn't do the job.  It has to be the act of bringing an

12   entity.  It has to be integral.  So years before it's no

13   good, years after it's no good.

14           We cited Luisa Essay v Guttierez (phonetic),

15   but, frankly, there are a lot of other cases that could be

16   cited for the same proposition that you can't have this

17   being, having a Delaware entity.  Their saying something was

18   done to a Delaware entity is no different than saying you

19   are suing over the incorporation entity, the act that

20   occurred years earlier.

21           Reach & Associates v Dencer, 269 F.Supp. 2d 497.

22   That is a decision by Judge Farnan in 2003.

23           Vice Chancellor Strine in 2000, the IM2

24   Merchandising v Tyrix, 2000 Delaware Chancery Lexus 156.

25   The act of incorporating in Delaware had nothing to do with

1    the underlying claim, is not alleged to have been in

2    furtherance of a conspiracy to unlawfully injure the

3    plaintiff.

4            I believe your Honor, in one of your opinions,

5    referred to CC Investors v Raytheon, a 2003 decision by

6    Judge Farnan, and that was a specific allegation in that

7    case, 219 FRD 328, that said the plaintiff alleged that

8    Travelair knew that this newly created LLC was not

9    financially qualified and capable of performing the duties

10   Travelair owed to plaintiff but, nevertheless, the duties

11   were assigned to the LLC, thereby breaching a contract.

12   Judge Farnan said:  Based upon these allegations, the Court

13   concludes the plaintiff has sufficiently demonstrated for

14   the purpose of 12(b)(2) the alleged breach of contract arose

15   out of the capitalization and formation of the Delaware

16   entity.

17           And that is in the -- the original case is

18   Papendick v Bosch, the Delaware Supreme Court, about

19   30 years ago.  If you sue about a breach of contract, the

20   act has to come -- the act of incorporation -- the claim has

21   to arise out of the act of incorporation.

22           Here, the only act in Delaware that counts, that

23   conceivably counts, that is really alleged to count is the

24   act of incorporating APC in 1997.

25           I'll just say for one second, there was the talk

1   of the convergence of APC LLC to APC Limited in 2002.   There

2   is also mention the fact there was a merger of the Ohio entity

3   a couple years later.   Those are legally insignificant acts

4   because by operation of law liability, any debts of one

5   entity, they're converted to another entity.   They just pass

6   through.   There can't be any wrongdoing or hindering by

7   converting from an LLC to a corporation or by merging from one

8   corporation to another corporation.   By operation of the law,

9   the debt transfers with the entity.

10          So the only thing they're really left with is

11   the act of incorporating APC in 1997 and whether that is

12   integral to the claims.   The problem there -- there is

13   numerous problems there.   There are problems of chronology.

14   There are contemporaneous documents about why APC was formed

15   in 1997 along with affidavit testimony.   There is a business

16   plan that was created about that time.   That is Exhibit 7 to

17   the Wright affidavit, DI 124-9.   There is a plan to create a

18   service company that would sell product and sort of

19   grandiose business plan for what they wanted to accomplish.

20   They wanted to make money.

21          The work on the *Joran*, as a matter of fact, was

22   not performed until 1998.   The delivery statement was issued

23   in September 21, 1998.   That's Exhibit B to Donald Keehan's

24   second affidavit, DI 126.

25          So work was performed September 1998.   The

1   damage was discovered in February 2009.  No dispute about

2   that.  That is in the arbitration claim, paragraph 9.  And

3   that's, among other places, attached as Exhibit D to Donald

4   Keehan's affidavit, DI 126.  And there is also a fax by

5   Mr. Keehan on February 17, 2009, talking about the fact that

6   there is some damage.  They claimed some damage.  That is,

7   again, DI 126, Exhibit C of Mr. Keehan's second affidavit.

8              In March 25, 2009, Mr. Keehan sought payment on

9   behalf of whatever, APS or GATT.  GATT said you owe us money

10  for work that's been done.  You pay us.  You know, we've

11  done the work.  Now the boat is being put in service, pay

12  us.

13             In 2009, later in 2009 --

14             MR. MANOS:  1999.

15             MR. FRIEDLANDER:  I'm sorry.  1999.  APC is

16  advertising in the industry journal that we did work on the

17  *Joran* in a successful application of our first ship using

18  this product.  That is put out publicly.  That is Exhibit N

19  and O to the Brennecke affidavit, DI 155-4.  So that is

20  1999.

21             There is no notice of a claim by Marnavi until

22  December 2002.  That is when the arbitration claim was filed

23  that was Manos.

24             Mr. Pesce, in his deposition, said he was not

25  aware of any notice having been given to APS, APC, anybody

1    on our side prior to the filing of arbitration in December

2    2000.  That is pages 120 and 134 of the Pesce deposition,

3    Exhibit Q, DI 155-3 and 155-5.

4              And the transaction, we actually get to a

5    transfer of assets from APS to APC.  That's in 2001, almost

6    four years after the incorporation, the formation of APC in

7    1997.  So to try to say that the formation of the entity is

8    integral to the claim is belied by the record that has been

9    created through full discovery.  It's really undisputed

10   about when things happened.

11             The next argument I'd like to turn to is the

12   statute of limitations for fraudulent conveyance.  That is

13   the same under Delaware law and Ohio law.  It's four years

14   from the date of the transfer or one year after the transfer

15   could reasonably have been discovered by the claimant.

16   There is no equitable tolling under that statute.  That is

17   in the Pereyron case, 2004 Delaware Chancery Lexus 46.

18   Chancellor Chandler made that clear.  The words of the

19   statute are clear.  There is no super-tolling beyond that

20   built into the statute, the one year from when the transfer

21   could reasonably have been discovered by the claimant.

22             Here, again, we're going back to the letter of

23   June 28, 2004.  The inquiry notice of that letter, the

24   identification of the receivership proceeding would have

25   allowed -- access to that docket would have made clear the

1   2001 transaction and the 2004 transaction of the transfer of

2   assets from APS.

3           In the answering brief on summary judgment, we

4   hear for the first time Marnavi is relying on unpled

5   transfers not involving APS, payments by APC between 2004

6   and 2009, even though it's alleged and there is documents

7   that APC is a profitable entity, making several millions of

8   dollars in the last couple of years, and this is taken out

9   of the taxable income of the company.  There is still plenty

10  of money left over.

11          There is no basis for them to be seen on behalf of

12  Marnavi as a profitable entity because they transferred money.

13  We get into that as to whether payments, they're deductible

14  expenses of APC, they're taxable to the stockholders, reported

15  as income to the stockholders.  That that is an intent to

16  hinder creditors of APS.  It's just way out of time, it's the

17  wrong entity, and it's transferred by a profitable company.

18          And just to show how far beyond they go in

19  trying to say, well, we just learned about other transfers,

20  they identify real property bought by Arlene Keehan in 1988

21  and sold by her in 2002.  Again, not assets of APS, not

22  something that they ever had a claim to; and, frankly, it's

23  based on public records of the property that is in the

24  same -- where the building, the building where APS/APC

25  operated, it's on the same industry publication that

 1   Mr. Pesce had known about for years and years and been on

 2   notice of.

 3              And then just to get my last argument very

 4   briefly, your Honor.  Because for the reason why there is

 5   no breach of fiduciary duty where there is a statute of

 6   limitations issue, for fraudulent conveyance and breach of

 7   fiduciary duty, why there is no standing or there is no

 8   assets left from the company, there is no capacity because

 9   there is no viable claim of wrongdoing, there can be no

10   alter-ego liability because alter-ego requires there to

11   be -- it's a high standard in Delaware to look past the

12   entity.  It requires there to be a finding that a vehicle

13   was used for fraud, and there is no actionable claim that

14   APS was used as a vehicle for fraud.

15              And, frankly, the claim of alter-ego just flies

16   in the face of the receivership proceedings in Ohio where

17   a secured creditor initiated appointment of a receiver,

18   receiver did its work, its work was overseen by the Court,

19   and the Court determined it was fair and reasonable for

20   the Keehans and APC to transfer a total of $600,000 to APS

21   which was then paid to the secured creditor.  That's how

22   the affairs of APS were resolved.  There is nothing left

23   for any other court to do and no actionable claim.

24              THE COURT:  You mentioned their taxes in

25   passing.  Is there anything in the record on the reasons for

 1   those transactions other than your client saying it was for

 2   a tax benefit?

 3            MR. FRIEDLANDER:  I believe there are tax

 4   returns in the record.  If I could turn over to Mr. Manos, I

 5   believe he could speak to it.

 6            THE COURT:  We'll wait until we get him up.

 7   That's fine.

 8            MR. FRIEDLANDER:  Okay.

 9            THE COURT:  And also the plaintiff references

10   testimony from Denise Keehan that the 2001 transfer of

11   assets from APS to APC was just a book entry.  Did they

12   accurately characterize that testimony?  Is that relevant

13   to any of these issues?

14            MR. FRIEDLANDER:  I don't -- and I don't want

15   to kick this over to Mr. Manos completely, but to the

16   extent people are describing it, there is the documentation

17   from that transaction.  There were book entries made.  There

18   was money paid, value paid for the interest of APC.  That

19   was initially $600,000.  It was basically a payment of the

20   book value of APC was paid.  And one thing that was learned

21   in this litigation, frankly, was they went and they subpoenaed

22   the secured creditor, Bank One.  And then you see in Bank

23   One's files, documents from that transaction.

24            So this is not a secret transaction.  Bank One,

25   the secured creditor, was owed a lot of money.  It was on

1     the scene during all the relevant time period, through 2004,

2     and there was an issue that was addressed in the preliminary

3     report of the receiver about -- the receiver learned about

4     this transaction in 2001 and looked into it.  So that was

5     discussed, it was at issue and it was resolved, resolved by

6     court order in February of 2004.

7                THE COURT:  Does the Court have the discretion

8     to go right to summary judgment with respect to your clients

9     or does it need to first determine if, in fact, there is

10    personal jurisdiction over your clients?

11               MR. FRIEDLANDER:  Well, there is, of course, the

12    intertwining aspect to it, but I'm trying to think of a

13    federal authority.  I know there is Delaware Supreme Court

14    authority that basically jurisdiction has to be decided

15    first, Branson v Exide Electronics that cites a bunch of

16    federal law, but I would defer to your Honor whether

17    jurisdiction has to be resolved first.  But, frankly,

18    jurisdiction as the Keehans does turn on several of these

19    issues of 12(b)(6) as to why there is no direct or consent

20    personal service possible.

21               THE COURT:  Okay.

22               MR. FRIEDLANDER:  Thank you, your Honor.

23               THE COURT:  Thank you.

24               MR. MANOS:  Good afternoon, your Honor.

25               THE COURT:  Good afternoon.

1          MR. MANOS:  The last time I was before this

2   Court, the case was in a posture where I had to accept as

3   true the allegations set forth in the complaint.  Among the

4   allegations was that my client Advanced Polymer Coatings was

5   a Delaware limited liability company.  That Donald and

6   Arlene Keehan, who resided in either Florida or Ohio, were

7   among its members, as were six other family members who were

8   not identified.

9          I moved to dismiss predicated upon the fact that

10  that allegation failed to establish diversity jurisdiction.

11  You asked me whether I was contending that diversity does

12  not exist?  My response is that is not my contention.  Had

13  they alleged that all members were Ohio residents, we would

14  not have moved to dismiss.

15          Well, the Court permitted jurisdictional

16  discovery.  It was never my intent to deceive the Court as

17  to the organizational status of Advanced Polymer Coatings.

18          I think it's important to look at who the

19  parties are in this case, and who contracted with whom at

20  what point in time.  Jilmar Shipping is basically a complete

21  stranger to the certification of the *Joran* as fit for the

22  carriage of corrosive chemicals.

23          The company that was chartering the *Joran* is

24  Marnavi.  Marnavi is the one who contacted the certifying

25  authorities, DMV and Rena (phonetic), and inquired whether

1    they would work with Marnavi to have *Joran* as the first ship

2    ever certified for the carriage of acids with this product.

3         Marnavi approached SEC, a shipyard in Italy,

4    which was a distributor of scientist coatings and asked if

5    they would participate in this program.  Now, Advanced

6    Polymer Sciences had a subsidiary at the time, Guaranteed

7    Advanced Tank Technology.  It was an Ohio limited liability

8    company formed to provide services to tank owners.

9         SEC contacted Advance -- I'm sorry.  SEC, the

10   Italian shipyard, contacted GATT and asked if GATT would

11   participate in the coating of the *Joran*.  An agreement was

12   reached and the three parties executed an agreement to qualify

13   the *Joran* for the carriage of acids.  The signatories to

14   that agreement are GATT, which is identified as a subsidiary

15   of Advanced Polymer Sciences Inc.; SEC, and it has a long

16   Italian name that I can't pronounce so I just call it SEC

17   and Marnavi.

18        Mr. Pesce, when he was deposed as the

19   representative of Marnavi, and he was the individual that

20   was involved in these negotiations, he acknowledged that

21   Marnavi and SEC and GATT were unable to come to terms of

22   price for the coating work and that SEC and GATT abandoned

23   the project.  Marnavi, however, continued with the project

24   and Marnavi arranged for the certification authorities to

25   certify the *Joran* as fit for the carriage of acids.

1          Jilmar Shipping fits in here only because they

2     are the entity that purchased the coatings from Advanced

3     Polymer Sciences on September 8th, 1997.  That is the

4     invoice from APS directly to Jilmar Shipping.

5          The coating work was undertaken in December

6     of 1997 and completed in 1998.  Jilmar Shipping sold the

7     *Joran* in December of 1997 before the coating work was even

8     undertaken.

9          Marnavi obtained the DMV certification and was

10    able to place the *Joran* in acid service in late 1998.  This

11    was a successful application done by Marnavi.

12         APS was never paid for the coating that Jilmar

13    Shipping purchased.

14         Approximately nine months after the *Joran* was

15    placed in acid service, it was discovered that when they had

16    hauled a load, a cargo of oil, that oil had contaminated the

17    fiberglass in the bottom of the tanks.  Fiberglass matting

18    had been put into the tanks to prevent the lining from being

19    damaged in the event that an item was dropped into the tank.

20         Marnavi, not Jilmar, contacted Mr. Keehan and

21    asked what would you recommend that we do to address this?

22    Mr. Keehan's response was you need to remove the contaminated

23    fiberglass and recoat it, and here is the price for the

24    coating you need and you need to pay your bill.  Well, they

25    elected not to do that.  Instead, the new owners of the *Joran*

1    contracted with another shipyard to replace the fiberglass and

2    recoat the bottom of the tank.

3              The allegation is that Advanced Polymer Coatings

4    was formed in 1997 to run away from this botched job.  Well,

5    at the time Coatings was formed, the job hadn't been

6    undertaken.  Coatings was formed in expectation that the

7    *Joran* would be certified for the carriage of acid, which

8    would open up an entirely new market for coating products

9    manufactured by Advanced Polymer Sciences.  Coatings was

10   formed as a coatings sales company.

11             The *Joran* was, in fact, certified for the

12   carriage of acids.  There are industry articles touting the

13   success of the conversion.  Those articles do not mention

14   Jilmar, they mention Marnavi as the company that was able

15   to obtain this certification.

16             Now, what transpires in 2000 is that Jilmar

17   initiates an arbitration in London contending that Advanced

18   Polymer Sciences agreed to arbitrate disputes over warranty

19   claims associated with their products.  They contend that

20   the coatings sold in September 1997 did not have the

21   chemical resistance set forth in Advanced Polymer Sciences'

22   literature.  Advanced Polymer Sciences denied it was bound

23   to arbitrate and, in fact, would not participate until the

24   arbitrator identified upon what document he rested his

25   authority.

1        When the arbitrator came back and said it was

2   the agreement between GATT, SEC and Marnavi, APS said we are

3   not participating any further, and that was the end of APS's

4   participation in the arbitration.

5        Jilmar, or Marnavi claiming to be the agent of

6   Jilmar, now wants to domesticate the arbitration award

7   against Advanced Polymer Sciences and then use that

8   domesticated judgment to pursue the assets of Advanced

9   Polymer Coatings.

10       Well, the first item that needs to be

11  established in order to recognize a foreign arbitration

12  award is that there be a writing signed by the party against

13  whom the arbitration award was entered.  There is no

14  arbitration agreement between Jilmar Shipping and Advanced

15  Polymer Sciences.  So as a fundamental basis why this case

16  should be thrown out is there is no way Jilmar Shipping is

17  ever going to be able to establish it is a creditor of

18  Advanced Polymer Sciences.

19       THE COURT:  Well, it's clear, I don't think it's

20  even in dispute, that Mr. Keehan is a signatory to that

21  July 1997 agreement; right?

22       MR. MANOS:  Yes, as the President of GATT, a

23  subsidiary of APS.

24       THE COURT:  Well, it seems that there is a

25  dispute on that.  At least initially, there was some

1   disclosures from you all that indicated that he was signing,

2   I believe it is Chairman of APS, but on behalf of APS.

3            MR. MANOS:  No, no, that is not.  I went back

4   and looked at what they were contending, and it was the

5   initial -- I may have it here.  It is the initial declaration.

6            The declaration, I believe it is Docket 126, and

7   they're referring I believe to paragraph 3 which Mr. Keehan

8   states:  I was the Chairman of APS in 1997.  Attached as

9   Exhibit A is the contract APS's Guaranteed Advanced Tank

10  Technology division entered into with Marnavi on or about

11  July 28, 1997.

12           There has never been a disclosure or an

13  admission that Advanced Polymer Sciences entered into a

14  contract with Jilmar Shipping for the certification of the

15  *Joran* as fit for the carriage of acids.

16           THE COURT:  Well, that's the declaration.  They

17  say there are also initial disclosures.  I think that maybe

18  DI 126-1.  I don't have it in front of me.

19           MR. MANOS:  I don't have the disclosures, your

20  Honor, but I would ...

21           THE COURT:  So your view is there is not even

22  any fact -- well, first of all, you agree this would be a

23  material dispute.  You have begun with it.  Clearly, if the

24  Court finds there is a genuine dispute as to the capacity of

25  which Mr. Keehan signed that 1997 agreement, then I need to

1    have further proceedings to resolve that factual dispute.

2             MR. MANOS:  Well, if there was a factual

3    dispute, but there needs to be some evidence to put a fact

4    in dispute.

5             THE COURT:  But, first, my question was you

6    agree that if there is a factual dispute there --

7             MR. MANOS:  Yes, sir.

8             THE COURT:  -- that I need further proceedings

9    to resolve it?

10            MR. MANOS:  That is correct.

11            THE COURT:  Okay.

12            MR. MANOS:  There is some question of the

13   capacity in which an individual signs a contract.  That

14   would be a question of fact.  Although I believe that at

15   least under Delaware and -- I'm sure under Delaware law,

16   the interpretation of a contract in the first instance is

17   a matter of law.  And I believe the plain meaning of that

18   contract and the fact that there are three signature boxes

19   for the three parties to that contract make it abundantly

20   clear who the parties to that agreement are.

21            THE COURT:  But here it seems more complicated

22   because you all asked the arbitrator to decide who were the

23   parties to that agreement that had an arbitration provision,

24   and the arbitrator seemed very clearly to have decided that

25   APS was a party.

```
1           MR. MANOS:  Your Honor, I did not ask the

2    arbitrator to decide who the parties were.  I asked the

3    arbitrator to identify upon what authority he thought he

4    could compel Advanced Polymer Sciences to arbitrate.  And

5    when he came and said it is that agreement between SEC, APS,

6    and GATT, we withdrew.

7           We do not waive our jurisdictional challenges to

8    an arbitrator.  I mean the case law is very clear on that

9    point.  The Court must conduct a de novo review of the

10   arbitration agreement to see if, in fact, the party that is

11   to be held responsible upon an arbitration award is in fact

12   the signatory.

13          THE COURT:  The plaintiff cites some case law

14   that seemed to suggest that once the arbitrator decides the

15   case is arbitrable that the Court must be defer to that.

16          MR. MANOS:  They may cite law, but that is not

17   what the law says.  And I would refer the Court to -- just a

18   second.  There is a Third Circuit decision that the Supreme

19   Court cited to that says just the contrary.  That would be

20   the China Minmetals Import and Export Co., Ltd. v Chi Mei

21   Corporation.  We repeatedly have held under FAA, including

22   our opinion of first options, in which the Supreme Court

23   affirmed our judgment that a party does not waive its

24   objection to arbitrability where it raises that objection in

25   arbitration.
```

```
 1              THE COURT:  Did you have a citation to that?
 2              MR. MANOS:  I'm sorry, your Honor.  It's 334
 3    F.3d 274.  And that's a Third Circuit 2003 decision the
 4    Supreme Court cited to favorably.
 5              I don't believe that Jilmar Shipping can ever
 6    establish that it is a judgment creditor of Advanced Polymer
 7    Sciences.  The statute of limitations for bringing an action
 8    for breach of warranty is four years from the date of
 9    delivery.  Delivery occurred in 1997.  They have never
10    initiated an action against Advanced Polymer Sciences for
11    breach of warranty within any court that had jurisdiction
12    over Advanced Polymer Sciences.
13              If somehow they're able to overcome the fact
14    that they do not hold judgments creditor status, they have
15    no basis for imposing that judgment upon Advanced Polymer
16    Coatings.
17              Initially, there were three allegations for why
18    Advanced Polymer Coatings should be responsible for the
19    warranty claims of Sciences.  The first was that Advanced
20    Polymer Sciences existed as a fraud upon creditors and the
21    Court should therefore pierce the corporate veil and proceed
22    against the shareholders.
23              Well, the shareholders of Advanced Polymer
24    Sciences were not Advanced Polymer Coatings.  Coatings was
25    a subsidiary of Sciences.  So in responding to summary
```

1   judgment, they acknowledge that we are no longer trying to

2   pierce the corporate veil.

3           So what we have now is a de facto merger or a

4   mere continuation.  De facto merger, the elements are very

5   clear.  You need to have a transfer of the assets and

6   liabilities of the corporation in exchange for stock.  The

7   medium of consideration in both transfers in 2001 and 2004

8   were cash.

9           Arlene Keehan, the sole shareholder of Advanced

10  Polymer Sciences, did not receive any stock of the acquiring

11  corporation.  She never received any cash.  She received no

12  consideration at all.

13          2004, the mode of exchange was again cash.

14  Arlene Keehan did not receive any of that cash.  That cash

15  was paid to Bank One, the secured creditor of Advanced

16  Polymer Sciences.

17          In both the 2001 and 2004 asset transfers, it

18  was Bank One that was dictating what assets could or should

19  be transferred.

20          Counsel for Marnavi deposed Harry Greenfield

21  who is the workout counsel for Bank One.  Mr. Greenfield

22  explained that because certain receivables of Advanced

23  Polymer Sciences had gotten more than 90 days old, they

24  were no longer eligible for inclusion on its borrowing base

25  certificate and Advanced Polymer Sciences was overadvanced

1  approximately $880,000.

2          That needed to be cured.  The way it was cured

3  is that Advanced Polymer Sciences transferred assets that

4  were ineligible for inclusion on the borrowing base report

5  to the balance sheet of Advanced Polymer Coatings.

6          Donald and Arlene Keehan sold their marital home

7  and refinanced the commercial property at 951.  Those monies

8  totaling $880,000 went into Bank One which brought APS back

9  into compliance with its borrowing base certificate.

10          There was no looting of the corporation.  There

11  was a conversion of illiquid assets to liquid assets.  The

12  balance sheet remained exactly the same.  That was the

13  testimony of Advanced Polymer Sciences and now Coatings

14  outside accountant Rob Whittall who was with the coating

15  company.

16          There was no mere continuation.  APS was a

17  Delaware corporation from 1987 until March 2004 --  I'm

18  getting my dates confused -- March of 2004 when its

19  corporate charter was cancelled.  Advanced Polymer Coatings

20  was an entity formed under Delaware law in 1997.  It existed

21  side by side with Sciences until Sciences was no longer an

22  existing entity and Coatings then continues on.  So the mere

23  continuation argument is just factually cannot be supported.

24          The two companies are not one and the same.

25  Advanced Polymer Coatings is not carrying on the business of

1    Advanced Polymer Sciences.  Advanced Polymer Sciences was a

2    manufacturer of composite resins that were used for a number

3    of different purposes.  One of those purposes was coatings,

4    and the coatings were sold initially within the chemical and

5    industry market.

6            Ultimately, Advanced Polymer Sciences hired an

7    individual named Joe Harrington to try to introduce it to

8    the marine market.  Upon introduction into the marine

9    market, it was discovered that coating large areas inside

10   these ships was very difficult and there were not many

11   people with the expertise to do it.  The coating had a

12   tendency to burn people.  That was Mr. Harrington's

13   testimony.  It became apparent that the resins that Advanced

14   Polymer Sciences manufactured were not going to be able to

15   be successfully introduced into the market.

16           It was then that they had an independent outside

17   company come up with a different resin.  Sciences purchased

18   that resin and then purchased the catalyst and mixed the two

19   into quantities that were available for sale at the same

20   time it continued manufacturing its resins for the other

21   purposes.

22           Coatings has never manufactured any resins.

23   Coating purchased product manufactured by third parties,

24   repackages, relabels it and sells it as its own.  So I agree

25   that Advanced Polymer Coatings has continued selling coating

1   into a market that APS at one time attempted to sell coating

2   into but we're talking about a continuation of a product

3   line as opposed to a continuation of business.

4           THE COURT:  But it is undisputed that APC

5   continued at least one product line that APS had.

6           MR. MANOS:  That is correct, your Honor.  They

7   continued selling protective coatings.

8           THE COURT:  Address the marketing materials in

9   which it appears from the record that APC is claiming some

10  of APS's history as part of APC's own.

11          MR. MANOS:  That is correct.  Advanced Polymer

12  Coatings was formed initially to sell products manufactured

13  by APS, and so what they are doing is advertising the

14  history and development of this product line.  The fact that

15  Mr. Hobrath found it easier just to use materials that he

16  had already created once for APS does not change the fact

17  that Advanced Polymer Sciences was still in existence at the

18  same time that Coatings was in the business of selling

19  coatings.  I don't see how that adds anything to the

20  equation.  The company was formed to sell the products that

21  APS at one time had manufactured.

22          THE COURT:  There is some references to tax

23  issues and research credit in which maybe APC used some of

24  APS's historical income in order to qualify for credit.

25  Talk about that.

1          MR. MANOS:  No, it's not qualifying for credit.

2     Actually, the investment tax credit requires that the gross

3     income of all controlled entities be grossed up for purposes

4     of the research and development.  I cited the IRS Code

5     section that requires that.

6          Rob Whittall, CPA, was asked about that, and he

7     said that was required under the regulations, but he wasn't,

8     for whatever reason, in a position to sit and explain how

9     the exact calculation worked without referring to the code.

10    That was his testimony.  But I did refer the Court to those

11    Code sections that treat Advanced Polymer Sciences and

12    Advanced Polymer Coatings as related controlled entities

13    because family members owned 100 percent of both companies.

14          So I mean that is just --  that's a calculation

15    mandated by statute.  There is no other way to do it, your

16    Honor.

17          Your Honor, if you have any other questions?  I

18    don't believe any of the causes of action that they have set

19    forth can have been established on the undisputed record

20    that you have before you.

21          THE COURT:  Okay.  I may have some more

22    questions for you later but for now that's fine.

23          MR. AMINI:  May I, your Honor?

24          THE COURT:  You may, yes.

25          MR. AMINI:  Thank you, your Honor.  Bijan Amini

1  for the plaintiff.  Good afternoon.

2          THE COURT:  Good afternoon.

3          MR. AMINI:  If I may, I'd like to begin by

4  generally describing our version, if I could, of the facts

5  in this case because I think therein lies the heart of the

6  dispute between the two sides on this motion.

7          APS, the original corporation, was created in

8  1986 with Arlene Keehan as its owner and its president.

9  There is some testimony in the record that it was created in

10 that manner because it was advantageous to have it owned by

11 a woman due to the fact that it was doing some government

12 contract work at the time.

13         However, the testimony is pretty uniform when

14 you dig underneath the surface that Donald Keehan was both

15 the COO and the CEO of the company at all times and ran it,

16 even though he disavowed any ownership in it whatsoever.

17         Ms. Keehan, herself, said she was only the

18 president in name.  So that when, for example, in 2001 --

19 and I will come back to this, repeatedly, I think.  In 2001,

20 when Ms. Keehan purchased, I believe I heard Mr. Manos say,

21 the receivables that didn't qualify and they took much more

22 than that at that time, when she purchased those, she signed

23 as the purchaser for APS and Donald Keehan signed as the

24 president.  I mean she signed as the purchaser for APC and

25 Donald Keehan signed as the president of APS because it was

1    convenient.  That's basically the situation we're dealing

2    with when it comes to Mr. Keehan.

3                APC, subsequently they announced that they were

4    organizing APC as a family corporation so as to allow for a

5    transfer of the assets generationally.

6                We recently uncovered and provided to your

7    Honor, in Exhibits 26, 27 and 28 of Ms. Wright's affidavit,

8    the litigation that was brought by Daniel Keehan.  Daniel is

9    one of the sons.

10                The way they worked it out on paper is they

11    divided it up 19 percent for Arlene -- this is APC now --

12    19 percent for Donald, 19 percent for two of the other

13    children, David I believe and Denise, and then six percent

14    each for four other children.

15                Daniel Keehan, I believe it is, apparently

16    having had a falling out with his family -- all right? --

17    recently brought an action in connection with a couple of

18    other offshoots that I will get to, claiming he was being

19    deprived of his rightful share of these corporations.

20                The pleadings which were submitted by Mr. Manos,

21    again, on behalf of both Donald Keehan and APC and also on

22    behalf of, I believe it's 5 Star Holdings, and I'll get to

23    what 5 Star Holdings in a minute, state in very clear terms

24    that these interests were only given to the children on the

25    condition that they recognize their father's absolute

1    authority over these companies and his absolute authority

2    over when and how they would receive any distributions.

3              With that in mind, I would also like to point

4    out to your Honor the letter that Mr. Manos sent to the

5    United States Attorney's Office in Ohio in 2007.  In 2007,

6    the United States Attorney's office, in connection with that

7    Bank One litigation that has been referred to with when

8    there was the receiver, obtained a judgment on behalf of

9    the Ex-Im Bank in connection with a project that the Keehans

10   were doing overseas that had failed when it was used

11   sometimes as the reason for the demise of APS.

12             Upon receiving this judgment and the amount of

13   $2 million, Mr. Manos wrote to the U.S. Attorney and he

14   stated -- I want to make sure I have this right.  If your

15   Honor will permit me.  I have it here.  I'm sorry.  It's a

16   August 13th, 2007 letter.  I believe it's Exhibit 23.

17             He stated he had personal knowledge of all the

18   underlying transactions; and he stated that they had, for

19   estate and succession purposes, had formed APC and divided

20   among the Keehan children the interests.  Then he went on

21   to state that his clients' role, they didn't want to enter

22   into a payment plan because of the age and they had a

23   minority interest in Advanced Polymer Coatings subject to

24   a closed corporation agreement which gave the other

25   shareholders the right to purchase the shares if they're

1    attached or encumbered.

2         Then he went on to say, I've been in contact

3    with the children, as though the children were somehow the

4    people who were going to make the decision on this.  And he

5    said, I have the authority to offer you $200,000 in exchange

6    for a full release of Donald and Arlene Keehan because they

7    had been guarantors of that Ex-Im bank judgment.

8         Then if you go to the tax return for 2007 for

9    APC, you will find that both Arlene and Don took $200,000

10   each out as the chief officers of APC.  That two of their

11   children took a lesser amount out, and there is no

12   indication that they gave any amount to any of the other

13   children.

14        The bottom line fact is from these documents

15   that Donald Keehan, since 1986, has operated all of these

16   corporations with his wife's assistance for his own personal

17   benefit.  The alter-ego theory that they need to address

18   is that, in fact, he has ignored all of these corporate

19   formalities and he has ignored all of these corporate

20   structures and used these corporations for his own personal

21   purpose, which is to enrich himself and his family, and

22   they have become very rich.  The numbers are there to be

23   seen.  Within the last several years, they've made millions

24   upon millions of dollars while telling the United States

25   Attorney's Office in Ohio that they're judgment proof and

1    can afford only, because of the generosity of their

2    children, to offer $200,000 for a $2 million judgment.

3              With that in mind, if you go back and look at

4    each one of the transactions that we're complaining of, they

5    can be seen in a very different light.

6              In July of 2001, the story as it goes is that

7    Arlene Keehan and Donald Keehan sold a piece of property for

8    approximately 800-and-some thousand dollars so as to pay

9    down a deficiency with Bank One.  And you heard I believe

10   Mr. Manos said in return for it, what they got were certain

11   past due invoices more than 90 days old.  I believe actually

12   the record is more than 120 days old in exchange for that.

13             In fact, what they did at that time, what they

14   used that for was to transfer the coating business from APS

15   to APC and to do it in such a manner, as your Honor pointed

16   out, when you look at all of the advertising, promotional

17   materials, and it's uniform throughout the promotional

18   materials, they did it in such a manner so as to not let

19   anyone know -- all right? -- that business has changed.  It

20   was still business as usual.  They actually started,

21   Mr. Harrington, who he referred to as the person they hired

22   in '94, to promote the maritime line.  Mr. Harrington

23   testified that they actually started using the APC name in

24   connection with APS in the year 2000, a year before or a

25   year and-a-half before this actual transfer.

1          I might point out APC, though, created in 1997,

2    and there was something made of that, and they pointed out

3    that they had some grandiose business plans, very grandiose

4    business plans, turned to be more than grandiose.  They

5    turned out to be outright false, as both Donald testified

6    to, Arlene testified to, Denise Keehan testified to.  We

7    have all of that testimony; and Mr. Manos testified, himself

8    during the deposition.  He took it upon himself to say all

9    of the statements in this business plan which was circulated

10   to an investment banker, with all these statements about how

11   APC had assumed all sorts of liabilities of APS, had been

12   capitalized in a certain way, that they were all untrue, had

13   gone dormant and had never been used, and it was activated

14   in July of 2001.  That is what their tax returns say.  That

15   is what their agreement says.

16          By agreement dated May 13, 2001, Arlene Keehan

17   entered into the agreement on behalf of APC -- well, on

18   behalf of herself I guess to buy the shares of APC or

19   however you want to -- however you measure.  I don't know

20   if it was an LLC.  I can't keep track of what these entities

21   are from month to month -- to buy the interest in APC from

22   APS and, as I pointed out to your Honor, with Donald Keehan

23   signing at that point, because it was convenient, as the

24   president of APS.

25          She entered into it on May 13th, 2001 and it

1    recites in that agreement one of the reasons they're

2    entering into that agreement is because they're having such

3    difficulties overseas with claims against the company.  It

4    actually recites that as a reason for transferring.  And

5    what they transferred at that time was they transferred

6    APS's coating business to APC.  It was as plain and simple

7    as that.

8            They, in their papers, they make a point of

9    saying there was a product switch or at least they seemed to

10   indicate there was a product switch at that point and that

11   in fact the product that APC was going to sell was not the

12   product that APS had sold up to that point.  That is also

13   untrue.  And there is documentary evidence in this record

14   that that is not true.

15           They had been selling something called

16   Siloxirane for a number of years between, I don't know,

17   maybe '86, whenever they started selling coatings, until

18   sometime in the '90s -- it's unclear from this record as to

19   when in the '90s -- and that product had apparently not

20   faired well, especially in the maritime area, and that

21   product might, in fact, have been the product that had been

22   applied to the ship in question.

23           They subsequently went and purchased from an

24   outside party another product.  It's referred to I believe

25   as 6020, it has a number, another coating product, developed

1    by that outside company independently of APC, APS, or

2    Mr. Keehan.

3              We have the records.  We deposed that company in

4    this case, and we have the records of that company, and

5    although the testimony is that that switchover from

6    Siloxirane to this product coincided with the purchase of

7    APC from APS by Ms. Keehan, in fact, the records show that

8    the purchases of that product began a year and-a-half

9    earlier, in the year 2000 -- I guess a year earlier, in the

10   year 2000.  That is Exhibit 29 to Ms. Wright's affidavit.

11             I do have to make one explanation about

12   Exhibit 29.  For whatever reason, when I was preparing for

13   this, I noticed Exhibit 29 went in unidentified except by

14   Ms. Wright's statement that it was a listing of sales.

15             We, for whatever reason, your Honor, we put

16   that, in that one instance, we put the wrong exhibit in.  It

17   doesn't have the exhibit stamp, Exhibit 3, to Mr. Cech.  I

18   think -- I don't know how to pronounce it, but it was the

19   CBC president or CEO's deposition, C-e-c-h.  His deposition

20   is in the record.  It's Exhibit 3 to his deposition which is

21   marked with page 5 and described at pages I believe 104

22   through 108 as a history of the sales of this company.

23             But they had been, for at least many months

24   before the switchover, selling this new or buying this new

25   product from CBC in large quantities, in the same quantities

1    you see going forward in their business.  All right?  So the

2    claim that this coincided with that is just not true.

3          The other part is that in their advertising

4    materials, in their publicly advertised materials, they

5    claimed that this product, both the prior product and the

6    current product, they made it out to be one and the same.

7    They're still selling their promotional materials.  They now

8    have, or they did, they named, it beginning some time in the

9    '90s, Marineline I think they called it; all right?  But

10   they also tout the fact that it has been patented, that it

11   was developed by them, that it's related to the Siloxirane,

12   and the gentlemen who produces the material for them in New

13   Jersey at the CBC company says it has absolutely nothing to

14   do with any patent of theirs.  It was not developed by them.

15   And his view of their patents -- he was a chemist -- was

16   that their patents wouldn't work.  What we could get is a

17   brick.  You wouldn't get a coating, you would get a solid

18   which you couldn't apply to anything.

19          That was his view.  So be it.  The important

20   part of the testimony to us was that even though they're

21   telling the world that this is a patented product -- and

22   this is an important point because it fits into the

23   receivership and certain other activities to it.  At the

24   same time that they created APC or they -- "created" is the

25   wrong word, I think.

1          In 2001, at the same time they activated APC in

2     2001, they also began buying this product, this 6020 through

3     a company called Polymers 2000 that Donald Keehan had

4     created in 2000.  In 2000, he created a company ostensibly,

5     he tells the world, to put his patents in it and then he

6     signs a license agreement.  Of course, he waits until after

7     the Bank One litigation but he signs a license agreement in

8     2004 with APC under which he says I, Donald Keehan, through

9     Polymers 2000, license my patented material to you in return

10    for $100,000 payment plus six percent of your gross sales

11    every year; presumably, as it recites in the agreement,

12    which we put into the record, on account of the fact that

13    I'm selling you something important.

14          In fact, what Polymers 2000 is doing, as

15    indicated by CBC's records, is that it's buying this product

16    from CBC and then handing it over to APC and then just

17    taking -- and then taking this money out under the guise of

18    a payment of a royalty for the patent, which doesn't exist.

19          In their brief, I think at page 5 of APC's

20    brief for summary judgment, they claim when Ms. Keehan put

21    $800,000 up for APC that APC still had $5 million of assets

22    at that time, by the end of 12/31/01.  That is what they

23    say.  That they had $5 million.  They purchased 886,000 of

24    its net book value, whatever that means.  Yet a year later,

25    in a letter to the receiver, which is Exhibit 19 to Mr. St.

1   Marie, Mr. Manos again writes APS sold substantially all of

2   its assets to Advanced Polymer Coatings in 2001.  APS owns

3   no patents, as though that is somehow significant.

4           There is this constant talk, when anybody is

5   trying to collect money from these people, about, well, the

6   patents belong to Donald Keehan, even though it turns out

7   that the patents are meaningless in all of this.  APC owns

8   no patents, so your responsibility as a receiver are limited

9   to liquidating the assets with APC doesn't -- APS doesn't

10  own.

11          The letter of January 28th, 2003 is fascinating

12  for a number of reasons, but mostly because Mr. Manos says:

13  All those assets are in the hands of my clients, the Keehans,

14  who are not going to give you access to it.  They're not

15  going to let you on the property.  They're not going to let --

16  they're not going to cooperate with you in identifying them.

17  They're going to give you no cooperation.  You have nowhere to

18  go on this.

19          And when you read the receiver's report, it's

20  quite clear that he interviews Bank One, which is his real

21  client, he interviews the Keehans, and the report otherwise

22  is unremarkable for knowing.  The receiver makes it

23  absolutely clear in his report, which I believe is Exhibit

24  II of the defendants, makes it absolutely clear that he has

25  undertaken no investigation whatsoever at that point, and,

1    in addition, that the transaction, as recited in the Court's

2    order, is a settlement between the bank and the Keehans

3    based on the bank's satisfaction of whatever assets are

4    there, and the Court simply blesses that, and then the

5    receiver is discharged.

6            The corporation is never dissolved.  The

7    corporation is left intact.  In fact -- and we put this into

8    the record -- the Keehans then subsequently file 2003 and

9    2004 tax returns for APS, after the receiver is discharged,

10   taking a loss on the company and doing whatever machinations

11   they doing these tax returns.

12           Those tax returns, by the way, all the tax

13   returns are fascinating to a variety of reasons, but APC's

14   tax returns are fascinating for the fact that even though

15   the Keehans claim to have given the corporation over to the

16   children right from the get-go in 2001, the 2001 and 2002

17   tax returns list Donald and Arlene Keehan as the 50 percent

18   owners of the corporation and the only officers of the

19   corporation.  It's not until 2003 that there are transfers

20   made to the children.  At that point, it's a very valuable

21   corporation and there is no indication of any gift tax or

22   anything else in giving those interests to the children.

23           All of this by way of pointing out that

24   Mr. Keehan has no regards for any corporate formalities or

25   any corporate form.  These are his companies.  He is in the

1    coating business.  It's been quite profitable for him.  All

2    right?  His public pronouncements are that he has been in

3    this business since at least 1994 and he has ships on his

4    list of ships that he has coated with his current product,

5    which he calls I believe Marineline 784.

6           There are actual promotional materials that

7    indicate that the current product, Marineline product 784,

8    even though it was first produced in 2000, and sold to him

9    in 2000, was used to coat ships in the '94, '95, '96,

10   including our ship, including the ship in question.

11          To the outside world, they indicated that

12   nothing has changed.  That they're still running the same

13   business.

14          Mr. Harrington said -- and I believe I may be

15   repeating myself.  Mr. Harrington said that they started using

16   the APC name when they were APS in 2000 and our client, when

17   he was deposed, said I make no -- what he effectively said in

18   his Italian way was I make no distinction between APC and APS.

19   I saw this as one family.  I saw Donald Keehan running this

20   show, and I saw that he was advertising it sometimes as APS,

21   sometimes as APC.

22          The statement he viewed the letter from

23   Mr. Manos -- I don't remember the exact words but as a ruse,

24   that statement was simply the ruse he thought was to put me

25   off the track of finishing my arbitration, by sending me a

1    letter that one of these companies was in some kind of

2    receivership.  That's the ruse he saw.

3            As far as he could tell, these people were very

4    successful, and they still are, very successful in running a

5    company which, from the outside world's perspective, had

6    been the same company since 1994 and run by the same person

7    since 1994.

8            So our argument simply is that this circumstance

9    we find ourselves is in really the epitome of, whether you

10   want to call it an alter-ego theory, whether you want to

11   say that APC was a de facto merger of APS, whether you want

12   to say that APC is the continuation of APS, whichever way

13   you call it, the facts are such that there are certainly

14   sufficient facts to go to a jury on whether Mr. Donald

15   Keehan has continued to run this company since its inception

16   really to the present as his own without any regard, and

17   that the corporate form should be ignored for that purpose.

18            I just want to make sure.

19            On the legal issues -- and I guess I will take

20   them in backwards order.  Let's start with the arbitration

21   perhaps.

22            Now what we have in this case is a collateral

23   attack on your Honor's findings and the order in the

24   companion case in which the arbitration was upheld.  I saw

25   that your Honor questioned whether he would have to have a

1    factual hearing on that issue.  But before you get to the

2    factual issue, the question becomes, have the conditions

3    been met to set aside that order?

4            Mr. Manos says that he took objection to the

5    jurisdiction of the arbitrator.  There are indications in

6    the record that he actually asked the arbitrator to decide

7    the jurisdictional issue.

8            The distinction of the cases that came up is,

9    yes, in fact, you don't waive jurisdiction by participating

10   in a hearing with the arbitrator.  You do not.  I think that

11   is pretty clearly the law.

12           However, you do waive it if you empower the

13   arbitrator to decide it.  It's a fine distinction.  Most

14   people go on to say I don't see that you have jurisdiction.

15   And I don't agree that you have jurisdiction.  All right?

16   So I don't think that you are even entitled to decide it.

17           And then the courts say, but if you go along in

18   the process -- you have to go along with the process of

19   deciding it, and then you can object to it.

20           In this case, that is not what the record

21   indicates happens.  In this case, it appears that Mr. Manos

22   told the arbitrator affirmatively that he wanted the

23   arbitrator to decide the issue.

24           That is why we cite the cases we do, and that's

25   why we take the position that that issue, once decided by

1   the arbitrator, you can't come back and say, no, I don't

2   like that decision.  I'm not partaking.

3            However, even if you view it as Mr. Manos says

4   you should view it, once the arbitrator made his decision,

5   the APS people, they abandoned it.  They refused to

6   participate.

7            Your Honor found actually in your findings in

8   the companion case that they did so, so as to frustrate the

9   plaintiff's attempt to recover in this case.  All right?

10  And then subsequently, when they came to this Court -- and

11  we weren't counsel initially, but when they came to this

12  Court with their original counsel seeking to have that

13  arbitration award confirmed, they refused to participate.

14  Your Honor even noted the corporate secretary, who I assume

15  was Mr. Manos, was in the courtroom at the time of that

16  argument.

17           They put forth no objection.  They were waiting

18  to see if we succeed on the alter-ego.  And if we succeed on

19  the alter-ego, then they want to go back and say let me

20  reopen it now.

21           I don't think that's the proper way to approach

22  it.  I think you have waived it if you didn't raise it then.

23           If you find that these companies are mere

24  continuations and they are alter-egos, then I think their

25  opportunity to go and object to that has come and gone.

1              THE COURT:  But you can't waive subject matter

2    jurisdiction on a federal court, can you?

3              MR. AMINI:  No, you can't not.

4              THE COURT:  So don't I have to get into this

5    issue then?

6              MR. AMINI:  No.  The distinction -- and perhaps

7    I misunderstand your Honor and I apologize for that.

8              The distinction is they waived their right to

9    a -- they had the opportunity to object to that confirmation

10   hearing.  That was the time to do it.  And by defaulting,

11   it's not -- see, subject matter jurisdiction isn't clear-cut

12   in that particular case, and it's as though a hearing were

13   held and the one side said I'm not going to participate, and

14   having done that, I think they waived it.  And I don't think

15   that by doing so, they waived subject matter jurisdiction.

16   I think they waived their right to object to subject matter

17   jurisdiction.

18             THE COURT:  Who was the party to the original

19   July 1997 agreement?  Is it APS or is it GATT?

20             MR. AMINI:  Well, it says GATT-APS, signed by

21   Donald Keehan.  And the recital is GATT, a subsidiary of

22   APS, and then in paren, (GATT-APS).  It's for a specific

23   price, okay?  And then attached to it is an invoice.  It's

24   also in Exhibit II in that very same price in which APS puts

25   out the invoice for the exact same amount to -- and I'm

1    trying to remember whether it was Marnavi or Jilmar.  I

2    don't remember who the accompanying invoice goes to, but

3    there is attached to it an invoice in the record.  So I

4    think the arbitrator -- and I wasn't there so I can't tell

5    you what the arbitrator decided or how he decided, but the

6    arbitrator presumably, having seen all these documents,

7    determined they were all parties to it.

8              THE COURT:  It seems that, and I don't recall if

9    it was you or predecessor counsel, but it seems a year ago,

10   in July of 2010, that it was Marnavi's position at least

11   that Donald Keehan signed the 1997 agreement not as chairman

12   of APS but as president of GATT-APS.

13             It seems in your briefs that are on the current

14   motion, you have taken the opposite view and said that he

15   has signed as an APS person and not a GATT person.

16             MR. AMINI:  I'd have to go back.  I apologize.

17   I have to go back and look at the record on that.

18             Donald Keehan, I do know from his testimony and

19   from the records we have, even though he is not an officer

20   of APS, regularly signed documents as officer of APS.  The

21   prime example being the signing of APS's assets to APC as

22   the president when his wife was, in fact, the president of

23   the company at the time and presumably the sole shareholder.

24             So if you look at the public literature, the

25   promotional literature, it promotes Donald Keehan, Donald

1    Keehan's inventions, Donald Keehan's companies of APS and

2    APC, as one and the same.  GATT was certainly -- the

3    particular agreement your Honor asked about says GATT, a

4    subsidiary of APS.

5              THE COURT:  Did you have more to say on the

6    arbitration?

7              MR. AMINI:  No, I think on the arbitration I'm

8    fine.

9              THE COURT:  How about the question of whether

10   this case should be viewed as a continuation of the

11   arbitration?

12             MR. AMINI:  That's where it's a jurisdictional

13   issue, too.  They are all sort of combined.  And I saw my

14   adversary said that, too.

15             If you view itself as we do, factually, as

16   simply a single continuation of one entity, run by a single

17   individual really for his benefit -- all right? -- and using

18   all these other forms so as to keep his creditors at bay,

19   at least at times in part -- all right? -- then, of course,

20   it's a continuation.  That is how we would see it.

21             We went to arbitration against Mr. Donald

22   Keehan's company that was doing the coating.  All right?

23   We got our award, and now we're trying to collect from

24   Mr. Donald Keehan's corporation that is still doing the

25   coatings.  That is the business that has continued.  That

1   is the business that has survived.

2           There is no real testimony that there was any

3   other real business.  There was testimony they did other

4   business but nothing of significance by the late 1990s.

5   They hired Mr. Harrington in 1994 and they put their efforts

6   into marine coating.  They called it Marineline.  They have

7   called it Marineline since 1994.  They say it's Marineline

8   784 since 1994, even though the product has morphed and

9   changed.  They said it was the invention of Mr. Donald

10  Keehan even though it's not.

11          And my client, he testified that he viewed it

12  as Mr. Donald Keehan and his company, and they were still

13  out and operating.  And when you see it that way, all of

14  these legal theories become a lot more, at least from our

15  perspective, they become a lot easier to deal with.

16          THE COURT:  Where is the reasonable diligence

17  on the part of your client, because in the meantime while he

18  is seeing them all as the same, he is getting indications

19  that maybe there are some problems, maybe he is going to

20  have trouble collecting, and yet it appears he just sits

21  back, stays in the London arbitration and takes his long

22  sweet time before he comes to this Court.

23          MR. AMINI:  You know, he is -- I don't mean

24  that pejoratively.  But I think what he said was simply, he

25  viewed this as tactical maneuvering by Mr. Keehan to get out

1   of this arbitration, and he wasn't going to let him out.  He

2   was going to see his arbitration through.  And when he got

3   his judgment, he was going to come and he was going to

4   enforce it, and he had no qualms.  His view was, I saw

5   nothing untoward because everywhere I looked they were

6   selling Marineline 784 as APC, which they had been selling

7   it as even when we were in the arbitration, even before

8   APS transferred the project.  They used the APC name and

9   were selling it in that name even before 2001, before the

10  transfer.  They were using it in 2000, the APC name in their

11  promotion, so he didn't see the distinction.

12            And he viewed that letter -- first, Mr. Manos

13  wrote a letter that said -- Mr. Manos wrote at least two

14  records that we have in the record:

15            One, he wrote a letter that my client has just

16  stopped trading and he has told me that I should not appear

17  in this proceeding anymore.  That followed the decision on

18  jurisdiction.  And so they viewed that as, okay, sour

19  grapes.  He is not going to come now.  He is grandstanding.

20  Let's go forward with this.

21            And then he sent another one that said, you

22  know, oh, by the way, APS is being liquidated by a receiver

23  in Ohio.  A receiver, by the way, who had no notice of our

24  existence.  There is nothing in the record to indicate that

25  the receiver would put any creditors on notice or that they

1    looked at any liabilities.  That is interesting.  That is an

2    important point, too.

3           There is an assumption built in that all these

4    assets belong to Bank One.  Sure, Bank One was the secured

5    creditor, but a secured creditor is only secured up to the

6    amount of his debt.  His debt was $3 million.  Mr. Manos'

7    brief said as of 12/31/01, the assets of the corporation

8    were $5 million.  That is what it says on page 4.  That

9    would mean that there was $2 million of assets in there, and

10   it can't be that Bank One, without notice to any creditors

11   whatsoever can say, well, I'm going to determine that all

12   these assets are only worth $600,000.  Take my $600,000 and

13   I absolve you, the Keehans, of any liability to anybody else

14   for things that you may have had at this point, which they

15   clearly had.

16           THE COURT:  We will leave Bank One in Ohio for

17   just a moment, but first let's go back to London and to

18   Italy and your client.  Time is going on.  He is getting

19   these letters from Mr. Manos.  They mean, who knows what

20   they mean, but your client has testified that he is at least

21   troubled by what their implication might be, and yet he does

22   absolutely nothing here in this country to try to effectuate

23   whatever rights Marnavi might have.

24           MR. AMINI:  I understand, your Honor.  And I

25   understand that view.  I really do.  I don't think what the

1    client meant was that he was troubled by that.  He viewed it

2    as maneuvering by Mr. Manos and Mr. Keehan that --

3             THE COURT:  But -- excuse me.  What does one of

4    reasonable intelligence, exercising prudent reasonable

5    diligence do at that point?  Do they just sit back and

6    keep litigating in Europe and not worry that that may have

7    adverse consequences when they try to collect on a judgment

8    here in this country?

9             MR. AMINI:  I think the first thing he thinks

10   is I have to get a judgment.  I'm going to go to the United

11   States and do what?  I'm sitting here in London.  I've got

12   an arbitrator that says I have jurisdiction over these

13   people.  The first thing I have to do is get a judgment.  He

14   doesn't get his award.  He doesn't get his arbitration award

15   until 2005, and he doesn't get his judgment here until 2009.

16            THE COURT:  He doesn't even ask here until 2008.

17            MR. AMINI:  2008.  I wasn't his counsel.  I

18   might have asked sooner if it were me, but I can understand.

19   He is sitting there.  He says, when he is sitting there, the

20   company is still operating.  He acknowledges that they're

21   coating ships in Turkey, and they're coating ships in Italy,

22   and he knows about that, and he acknowledges he sees that.

23   And he says I don't see any difference.  I see the same

24   company.  I don't see the distinction between APS and APC.

25   And when I was -- even before they made the transfer,

1    although he doesn't recognize when the transfer is, he says

2    it was APS or APC, they were one and the same to me, and

3    they were still out there doing business.

4         So when Mr. Manos said something to the effect

5    of APS being in the hands of a receiver, he didn't think

6    anything of it.  Should you and I have thought something

7    about it?  Perhaps.

8         THE COURT:  Your argument clearly is a

9    reasonable person would not think anything of that.

10        MR. AMINI:  I think a reasonable person in a

11   foreign country pursuing an arbitration, not having been in

12   a United States courtroom, and there was no indication he

13   had ever been in this jurisdiction, I think a reasonable

14   person would say to himself, I get my judgment.  I will try

15   to collect.  If I can't collect it, I'll hand it over to the

16   American lawyers.  And I think that is what he did.

17        He said at some point he handed it over to the

18   American lawyers.  He can't even tell you when he came to

19   any knowledge or anything.  He says at one point, I just

20   handed over my arbitration award to the American lawyers.

21   And his whole deposition, if you read it -- and I wasn't

22   there, but, and we gave it a lot more leeway than we

23   probably should have, but his whole argument was, well, when

24   did your lawyers go look for this?  And what did they tell

25   you about it?  And he was to give it to the U.S. attorneys.

1     So maybe, maybe, if your Honor should hold it against him,

2     he has got some action against the U.S. attorneys.

3          THE COURT:  Let's talk about Ohio for a moment.

4     It is interesting that you didn't receive any notice, but I

5     wasn't clear on what is the legal basis on which Marnavi as

6     an unsecured creditor at the time was entitled to some type

7     of notice?

8          MR. AMINI:  I don't know whether he was entitled

9     to notice or not, but I don't know that the receiver, core

10    receiver can release all the unsecured creditors claims on

11    the grounds that having represented Bank One, he settled --

12    it actually says in the order that the receiver takes no

13    position.  Bank One effectively says -- Bank One has said

14    this is what they want to settle for, and the Court says

15    fine.  And the Court says we're relying on Bank One's

16    calculation of what this -- the plaintiff's calculation of

17    what these assets are worth.  And the plaintiff just wants

18    to get his $600,000 out and go.

19         You contrast that to the statement that as six

20    months before, some period before, short period, APS stopped

21    functioning in the Spring I believe of 2002 completely, just

22    shut down.  And I believe there is something in the Ohio

23    litigation says that.

24         You contrast that to Mr. Mano's statement as of

25    12/31/01, I have $5 million of assets.  So I would suggest

1    to your Honor, there wasn't any fairness in that proceeding.

2    It really is no different from the foreclosure case.  The

3    Ex -- I can't pronounce it, <u>Xperex</u> case, in the sense there

4    was also a secured creditor.  He had a customary foreclosure

5    sale.  He sold his claim to people who were related to the

6    company.  They foreclosed, and they said, well, we are

7    entitled to foreclose.  We had a security interest.  We

8    held the sale.  We bid in the price.  Thank you very much.

9    Good-bye.  And the Court held it doesn't pass the smell

10   test.

11         This is a case where, if you look at all of

12   the representations to the receiver that you see, you look

13   at Mr. Manos' letter to the receiver, you look at the

14   receiver's own report, they all don't quite tell the story

15   what is going on.  They all tell the story of a company

16   that sold all of its assets in 2001, when they say now

17   they didn't -- all right? -- that was completely reliant on

18   Mr. Keehan for his patents, which he could take away at any

19   time, which was just, to this day, it's a fallacy out there.

20         The whole world thinks these Marinelines are

21   built on some patents but they're not.  They're built on a

22   product that you and I can buy from a New Jersey factory.

23   So they're all operating under false premises, and the

24   Keehans are doing nothing to correct that, for good reason.

25         Because at the end of the day, what they get

1    from all of that is, look, we're free and clear.  We got

2    sued by Bank One.  The best thing that ever happened to them

3    was a receiver.  So the receiver came in, did nothing.  Bank

4    One settled with us, the receiver blessed it, and now you

5    are all out of luck.  That is basically the story we are

6    stuck with from a factual standpoint.  That is the factual

7    divide.

8              THE COURT:  Well, the claims that you are

9    talking about are claims that belong to APS, are they not?

10             MR. AMINI:  No, I think the creditors had claims

11   in that.  I don't think those are just APS's claims.

12             THE COURT:  Tell me what the creditors claims

13   are that you are now asserting, and what is the legal basis

14   for asserting those claims?

15             MR. AMINI:  The claims are against APC as a

16   continuation of APS.  That all they did was move one company

17   to the other, and they settled a $3 million claim with the

18   bank for $600,000; and he claimed by settling the $3 million

19   claim with the bank for $600,000 that he was absolved of any

20   other claims that he has as to anybody else, because the

21   bank had a security interest at some point in all of its

22   assets.

23             THE COURT:  Are any of the claims that you are

24   asserting derivative claims that belong to APS?

25             MR. AMINI:  I don't believe they are.  I mean

1    there is a waste and breach of fiduciary duty claim, but I

2    think that the creditors in the circumstance -- and they're

3    taking the position, it's their position facially that they

4    were absolved, I think you have direct claim.  Certainly,

5    the complaint -- I didn't draft of the complaint but the

6    complaint doesn't say -- doesn't seek a derivative claim.

7    It's a direct claim.

8             THE COURT:  If they were viewed as derivative

9    claims, do you concede that they went to Ms. Keehan in the

10   transaction between APS and Ms. Keehan?

11            MR. AMINI:  No, I wouldn't, because the file

12   on that matter is sufficiently -- there is a sufficient

13   explanation to show that what is going on is Bank One is

14   settling its claim and the receiver is doing nothing.  He

15   is just a figurehead in there to facilitate, and he is

16   operating on information that is either not given to him or

17   wrong.  And the people who had an opportunity to give it

18   to him -- he is a receiver after all.  So you come in as a

19   receiver.  Who has the obligation to cooperate with you?

20   These officers, correct?  APS.  And who would that have

21   been?  Arlene Keehan, Donald Keehan, and Denise Keehan.

22   Those three at a minimum, perhaps David Keehan.  All right?

23            He said he met with all of them.  Then when you

24   see his report, his report is clearly built on facts that he

25   doesn't understand.  He is concerned that these patents he

1   has no control over are out of his jurisdiction, out of his

2   hands, and therefore there is nothing he can do to solve of

3   the problem.

4           Mr. Manos writes in a letter saying my client

5   has all these assets in their possession and we're not

6   letting you in the front door, and he writes that letter on

7   January 23rd.

8           They then move to compel a settlement that

9   they supposedly reached in October of '03 in a conference

10  with the judge.  They go see the judge on February 4th

11  and, lo and behold, they have a settlement, $600,000 for a

12  $3 million claim.

13          THE COURT:  But the judge puts it all in an

14  order and signs it.  And now you are asking me to look

15  beyond it and I guess cast doubt on the judge's order?

16          MR. AMINI:  No.  The judge's order simply says

17  they accept the plaintiff's valuation for these purposes,

18  and the judge's order actually says this indicates that this

19  is for the benefit of Bank One.  It doesn't indicates it's

20  for the benefit of anybody else.  It doesn't indicate it is

21  for the benefit of the Keehans.  It doesn't say the Keehans

22  are getting anything free and clear.  I don't believe the

23  order says anything about that.

24          The order just says I'm willing to sign off on

25  this, and I'm willing to give the receiver a $3,000, or

1    whatever it is, however much money he was given the receiver

2    for having stood in there, but the judge's order doesn't

3    say that the Keehans are absolved or that anybody else is

4    involved and any creditors can't continue to pursue the

5    Keehans for having moved the assets over, say, in 2001.

6         I don't think the order prevents that action,

7    doesn't preclude it.  And they haven't cited any Ohio law

8    that I have seen that says that that does.  It's not a

9    bankruptcy, per se.  You know, a federal bankruptcy has

10   its purpose because you bring everybody else in on notice.

11   We're looking at this receivership as though somehow it is

12   a federal bankruptcy.  It's not.  And there has been no

13   indication in this record that it operates that way.

14        It's not a circumstance in which all the

15   creditors are brought under one tent, one umbrella, and the

16   claims are then resolved as amongst all of them.  What is

17   resolved here is a secured creditor's claim which he

18   resolved for an amount that, on its face, seems low, but

19   that was the secured creditor's choice.

20        The judge's order does nothing in terms of

21   absolving the Keehans or the corporation.  In fact, they say

22   the corporation is judicially dissolved.  That is what they

23   like to say.  There has never been a judicial dissolution

24   of this corporation.  They continued to run it after the

25   receiver is gone.  How else does it file its 2003 and 2004

1   tax returns?  The receiver didn't file them.  Denise Keehan

2   signs them.  At least, the 2003 one.  It's not clear to me

3   who signed the 2004 one.  But they step back into APS and

4   sign tax returns and serve them on the Federal Government,

5   so ...

6           THE COURT:  We're talking about APS as a

7   corporation.  The record does contain an indication that the

8   Secretary of State's Office here in Delaware recognized APS

9   as a voided entity for nonpayment of taxes as of March 2004;

10  is that correct?

11          MR. AMINI:  I saw that.  Yes, your Honor.  The

12  record does indicate that.  It also filed tax returns in

13  2005 with the Federal Government.

14          THE COURT:  Are you still contending that the

15  October 1997 formation of APC LLC in Delaware was part of a

16  scheme to avoid paying Marnavi?

17          MR. AMINI:  Well, it was certainly part.  It

18  looked to have been part of a scheme to avoid paying -- to

19  avoid certain creditors because the only document we have is

20  a business plan that, on its face, is a fraudulent one, and

21  they all admit is a fraudulent one.  So it was part of some

22  kind of scheme, and then it went dormant.

23          So even if I don't have to worry about 1997,

24  they allow it to go dormant, and they, themselves say they

25  reactivate it on July 1, 2001.  It files no tax returns with

1   anybody that I am aware of prior to July 1st, 2001.

2         THE COURT:  So your contention is that there is

3   enough in the record, though, from which a reasonable

4   fact-finder could find that the formation of APC in 1997 was

5   part of an overall scheme to defraud creditors?

6         MR. AMINI:  Yes.  We certainly put enough in the

7   record to show that they were already having problems.  They

8   started these coatings in '94, so they already had problems

9   with other ships by that point, and they were already --

10  they were already in financial difficulty.  I don't know if

11  they were in financial, but they were already being -- there

12  is an indication in the record they were already -- claims

13  were already being made on account of other ships.

14        THE COURT:  Are you still seeking a declaratory

15  judgment that APC operated essentially as APS after a de facto

16  merger in order to evade APS's creditors?

17        MR. AMINI:  Absolutely.

18        THE COURT:  So you have seen at least the

19  briefing on what the elements are under Delaware law for

20  establishing a de facto merger; correct?

21        MR. AMINI:  Yes and no.

22        THE COURT:  So go through for me those elements

23  and what evidence is in the record from which a reasonable

24  fact-finder could find each of those elements.

25        MR. AMINI:  I read the Ex --  I want to call --

1          THE COURT:  Xperex.

2          MR. AMINI:  Yes.  I have to read it off of a

3    card.  (Continuing):  -- the Xperex case to say that there

4    are no -- that it's a court of equity.  That there are no --

5    there are no hard and fast factors.  The factors they cite,

6    by the way, are from a case in 1881, as I recall.  That's

7    the case that is cited out of the Eastern District of

8    Pennsylvania, if I'm remembering it correctly.

9          If you look at the -- I'm sorry that I have such

10   a hard time with this -- the Xperex case.  If you look at

11   the Xperex case; all right?  He is concerned more, you know,

12   at the end of the day, I think is the chancellor, but at the

13   end of the day, he talks about smell test.  He doesn't talk

14   about any of the factors.  And, in fact, in the Xperex case,

15   those factors didn't exist.

16         THE COURT:  So should I take that as a

17   concession that if this Court applies the factors, that you

18   don't believe you have the evidence to meet each of those

19   factors?

20         MR. AMINI:  If the factors we're talking about

21   are the sale of the stock, then yes.  There was no -- it was

22   they simply took it over.  There was no exchange of stock.

23   It was cash, and they took the company over, presumably for,

24   as counsel said today, for these past due invoices, but

25   really what they took over was the coating business which

1    was the only profitable part of the business at that point.

2              THE COURT:  Are you still seeking a declaratory

3    judgment that APC is the mere continuation of APS?

4              MR. AMINI:  Yes, for the facts that I have tried

5    to explain to your Honor today.

6              THE COURT:  Does the record show that APC was a

7    wholly owned subsidiary of APS at one point?

8              MR. AMINI:  Yes.  All the membership interests

9    were owned by APS.

10             THE COURT:  Does the record show that APC and

11   APS both existed at the same time for some period of time?

12             MR. AMINI:  They certainly -- if you take it

13   from the moment of activation rather than merely applying

14   for and creating -- if you take it by activation, I think

15   economic activity which then causes you to file returns,

16   yes, they existed.  They both existed.  I mean we contended

17   that, yes.  They would have existed.  There would have been

18   concurrent existence at least through 2004, measured by tax

19   returns.

20             THE COURT:  So doesn't that create a problem for

21   a mere continuation theory if they had coexistence?

22             MR. AMINI:  Well, here is what happened.  The

23   record also shows the following:

24             For a short period of time, between July of 2001

25   and October of 2002, APS continued buying the 6020, the

1    product and shipping it to APC.

2                In October of 2001, Polymers 2000 took that

3    over.  And,

4                By the Spring of 2002, all of APS's activities

5    had ceased.

6                That is what the record shows.  Those are simply

7    the facts.  I have no reason to doubt them.

8                THE COURT:  And you are still, I take it,

9    seeking a declaratory judgment that all of the defendants,

10   including the Keehans, are alter-egos of APS?

11               MR. AMINI:  Yes.  Yes.  Well, "including the

12   Keehans" being Donald and Arlene.  Right.  We did not

13   include the children.

14               THE COURT:  The defendants understood you to

15   no longer be in pursuit of seeking to pierce the corporate

16   veil.  Are they correct that you are no longer seeking to

17   pierce the corporate veil?

18               MR. AMINI:  That's what our footnote says.

19   They're correct.

20               THE COURT:  And you meant that then.

21               MR. AMINI:  I believe so.

22               THE COURT:  You repeatedly write that theme

23   throughout the case that the Keehans have no credibility.

24   Do you think the Court can make a credibility determination

25   in this procedural posture?

1             MR. AMINI:  No.  Well, I think the Court can

2    make a determination that if they have no credibility, then

3    there are factual issues that need to go to trial.  You

4    can't take them at their word for what they did.  Yes, I

5    paid $886,000 and I took over $886,000 of goods.

6             It goes back, first it's, you know, I took the

7    coating business.  Then it's I took some receivables.  I

8    mean, you know, Donald Keehan and Arlene Keehan did that

9    legitimately, with Donald Keehan signing for it.

10            You know, once their credibility comes into

11   question, I think that is the heart of the alter-ego theory.

12   It goes to the heart of that matter.

13            THE COURT:  And am I right that you find in the

14   initial disclosures on behalf of some defendants support for

15   your view that APS was a party to the original July 1997

16   agreement?  I tried to get to that with Mr. Manos.

17            MR. AMINI:  Yes.  I have to go back.  I was

18   trying to find it while you were getting into it with

19   Mr. Manos and I could not pull it up either.  I can look for

20   a cite.  I just need to find the initial disclosures.  I

21   didn't find it.

22            THE COURT:  I think it's in your belief somewhere.

23            MR. AMINI:  Okay.  I can go back and look.

24            THE COURT:  All right.  Well, you were at the

25   beginning of what you were going to pursue as the legal

1   arguments, and then I took you on a lot of questions I had,

2   but I want to make sure you had the chance to say whatever

3   else you were intending to say.  I did not mean to prevent

4   that.

5          MR. AMINI:  No, I don't think you did.  And I

6   think what I haven't said is in our briefs so I don't see

7   any point in burdening you with repeating them.

8          THE COURT:  Talk I guess for a moment about the

9   Delaware long-arm statute.

10          MR. AMINI:  You know, in simple terms, I would

11   analogize it to your Honor's decision on the long-arm

12   statute when you applied -- I believe you applied the

13   long-arm statute to APC's motion to dismiss.

14          When you consider the fact that every time

15   somebody gets close to these people, they switch corporations

16   and move their assets so as to avoid having to deal with

17   creditors on a fair and equitable basis, then I think if you

18   use Delaware corporations to do that, then I think you subject

19   yourself to jurisdiction.

20          There was one point -- and just by way of

21   illustration, not really that I think it's material or

22   outcome determinative, but there was some reference to 2009.

23   In 2009, they moved the current APC, whatever form it was in

24   Delaware, to Ohio.  And if you look at the timing of that,

25   your Honor, you had a hearing on March 27th I believe of

1   2009 about jurisdiction.

2           Mr. Manos created the Ohio corporation ten days

3   later.

4           You then indicated in a phone conference,

5   which I was not part of, I think on April 27th -- all right?

6   -- your decision and asked us for findings of fact and

7   conclusions of law.

8           A week later, they transferred the Delaware

9   corporation.  They merged the Delaware corporation into the

10  Ohio corporation so that at least this wouldn't happen to

11  them again and they wouldn't be subject to Ohio jurisdiction

12  after that.

13          I only use that as an illustration of what I am

14  facing in terms of trying to pursue collection on this claim

15  from people who have used the exact same assets from Day One

16  for their incredibly profitable benefit for all of these

17  years -- all right? -- and have managed to settle with Bank

18  One for $600,000 on a $3 million, and have told the U.S.

19  Attorney, who was trying to get a $2 million judgment on

20  Ex-Im Bank, that they are penniless and they relinquished

21  control of that corporation.  They only own 32 percent --

22  although in fact the tax returns say they own 38 percent --

23  they only owe 32 percent, and they have to get their children's

24  permission to offer $200,000 to the U.S. Attorney.

25          There is just something wrong with that.  There

1   is something wrong with proceeding that way.  They teach us

2   in negotiation seminars that truth goes a long way, and that

3   you have to at least try to be truthful in your negotiations.

4   There was nothing truthful about that statement, nothing

5   whatsoever.  That's what I've been dealing with.

6           So it's hard.  The circumstantial evidence is

7   there.  We would argue that we're entitled to a jury to hear

8   these claims.  That's why credibility is so important.

9           THE COURT:  Is there anything else?

10          MR. AMINI:  No.  I don't think so, your Honor.

11          THE COURT:  Thank you very much.

12          MR. AMINI:  I appreciate your time.

13          THE COURT:  I'll give defense counsel a chance

14  to have the last word.

15          MR. FRIEDLANDER:  I want to start with a couple

16  citations I was looking for initially.

17          You asked, your Honor, if there was a reference

18  to other litigation in the record.  The preliminary report

19  of the receiver, DI 155-8, page 42.  One question the

20  receiver had for the Court was:  Is the receiver to continue

21  to defend the suits brought in federal court against APS?

22          So, clearly, that was an issue.  The receiver

23  knew about other litigation.  We talked about how it's not a

24  requirement of Ohio law to either notify those people or to

25  give notice to them and such.

1         And that leads me to my next point.  I was

2    looking for the quote when I was up here before.  It's

3    In Re:  Dow, one of the cases we rely on, 2008 Delaware

4    Chancery Lexus 147, where the chancellor observes, says:  In

5    short, petitioner cannot use Section 279 to bypass the

6    three-year limitation under Section 278 when a dissolved

7    corporation holds no assets.

8         And what is 279 is an application to go to the

9    Court of Chancery to ask for an appointment of the receiver

10   and saying 278 has a hard and fast rule, three years, and

11   you can't use 279 to go around 278.

12        This is like this to the Nth degree.  When I hear

13   my friend, it's like he really wishes he was the receiver in

14   Ohio, and maybe this was a 60(b) motion in Ohio to reopen the

15   receivership say in June or July of 2004 and saying, hey,

16   there is more assets here.  There is more stuff here.  This

17   receivership should not be closed.  It should be reopened.

18   And he is coming to this Court in 2008 and he is not seeking

19   anything pursuant to Section 278 or Section 279 or to reopen

20   the judgment in Ohio.  Instead, he is appointing himself,

21   Marnavi is appointing itself as the receiver of APS.  That

22   it can just go out and pursue claims on behalf of APS and

23   somehow bring assets back to APS.

24        The barriers to that are significant, and

25   they're the ones that on which our motions are based.

1    There's the barrier of 278.  There's the barrier of a

2    state court judgment in another jurisdiction.  There is the

3    barrier that you are doing it after the three-year period

4    has lapsed, after equitable tolling has lapsed, after the

5    statute of limitations has lapsed.  You just cannot pretend

6    to assume that you are a role which a court has not

7    appointed you to have.

8            And then as for derivative claims, the <u>Gheewalla</u>

9    case is squarely on point.  There are no direct claims of

10   creditors.  What creditors can do is sue derivatively.

11   Well, suing derivatively means you're marshaling the assets

12   of the corporation.  You're saying what is an asset of the

13   corporation and you are trying to bring assets into the

14   corporation through your claims.

15           But what happened in Ohio was that the assets

16   were disposed of pursuant to a court order, pursuant to a

17   process.  And there is dignity, as Your Honor knows, to the

18   dignity that any court, especially a federal court, owes to

19   a state court proceeding, an order entered, especially when

20   the order was entered years, four years before this case was

21   filed.

22           There are remedies, but if you sleep on your

23   rights, there could be remedies that could have existed

24   which no longer exist.  And the quote from Mr. Pesce says

25   he thought it was a deceiving maneuver.

1          So we have a summary judgment record with all

2     the publicly available facts, and my friend says the

3     receiver didn't do a good job, and yet the whole complaint

4     is based on -- is taken out of what he learned by pulling

5     up the docket in the receivership proceeding, or what his

6     present counsel did.

7          It's not just a guy, an Italian guy in Italy.

8     There was counsel in London.  This was an internationally

9     sophisticated firm.  The counsel from London was sitting

10    with Mr. Pesce when I deposed him.  He gave me a brochure

11    about all their great offices all around the world.  The

12    Salans law firm.  And they chose to do nothing, and they

13    chose to disregard sort of basic fundamental precepts of

14    American law and about jurisdiction, about the distinction

15    between entities, and the significance of a receivership

16    proceeding in which all the assets of an entity are sold

17    when the only claim you have is as a creditor to get assets

18    of that entity.

19         It can't just be wished away, as your Honor

20    knows.  And that is why, as I said, we have the motion

21    pursuant to Section 278, pursuant to the cutting off of the

22    assets and a lack of standing, pursuant to the statute of

23    limitations.  And there is no jurisdiction.  There is no act

24    in Delaware.  They can't walk into this courtroom or any

25    other federal courtroom and just say because some guy is the

1    guy behind the curtain, they get to name him as a defendant

2    when there is absolutely no act in Delaware.

3            Our motion is not based on something like, oh,

4    Mr. Keehan is not a director, he is not an officer.  That

5    is not what this is about.  It's about there is no Section

6    3114 jurisdiction because there is no claim for breach of

7    fiduciary duty, because the only claim there can be is a

8    derivative claim and the time has lapsed and the standing

9    has been divested.  And there is no act in Delaware.

10           And I kept looking for when the points of my

11   counsel's intersect with mine, and I don't see here any of

12   the facts that are germane.  Our summary judgment motion

13   gentlemen, our motion to dismiss are based on very few

14   pretty good facts.  There is a substantial record on this,

15   for instance, on what Marnavi knew and didn't know and how

16   it treated the letter it did receive.  Instead of trying to

17   float that in on a motion to dismiss, we know about the

18   letter.  We obviously knew about the letter.  We got receipt

19   of the letter.  We got all their documents.  We got their

20   deposition.

21           They knew all this stuff.  Their reasonably

22   prudent person would have done something different than what

23   they actually did.

24           Frankly, your Honor, I'd like to turn it over to

25   my co-counsel to deal with some more factual issues.

1          THE COURT:  That's fine.  Thank you.

2          MR. FRIEDLANDER:  Thank you.

3          MR. AMINI:  May I interject one thing?  Not with

4     respect to his argument but what you had asked me about.

5          THE COURT:  I will give you a chance at the end.

6          MR. AMINI:  Because I thought you might ask

7     Mr. Manos about it.  You had asked about the voluntary

8     disclosures.  I found it.

9          THE COURT:  Okay.  You can put it in now.  Come

10    back to the podium and tells us.

11         MR. AMINI:  I'm sorry.  It's at 165-4, and it's

12    Exhibit 25 to Ms. Wright's declaration.  And it's, one, two,

13    three, the third paragraph down.  It says on July 28th,

14    1997, APS, and Marnavi, the chartered vessel *Joran* and

15    shipyard SEC entered into an agreement.  The coating was

16    carried out at a cost to Marnavi.

17         THE COURT:  And that was DI 165?

18         MR. AMINI:  DI 165-4.

19         THE COURT:  Initial disclosures of defendants?

20         MR. AMINI:  I just have to get to the first

21    page, your Honor.  I'm sorry.  The defendants' initial.  It

22    just says the plural defendants.

23         THE COURT:  Okay.  Thank you very much.

24         MR. AMINI:  Thank you, your Honor.  I'm sorry.

25         THE COURT:  Mr. Manos.

1          MR. MANOS:  Yes, your Honor.

2          Throughout the argument that I had listened to,

3    there is this repeated emphasis that Advanced Polymer Sciences

4    sold its coating business to Advanced Polymer Coatings.  The

5    report from the receiver advising the Court about this

6    June 2001 transaction -- and it's Document 155-8 -- recited

7    that the assets sold included accounts receivable, inventory,

8    furniture, and fixtures, and automobiles.

9          If you take a look at the APS tax return for the

10   year ending December 31, 2001, its depreciable manufacturing

11   assets remained on its books.  Those assets had a value of

12   approximately $2 million dollars.  It also had $1.5 million

13   of eligible accounts receivables.

14         When the receiver came in in January 2003, he

15   was provided a list of manufacturing assets that remained on

16   the books of APS, and he was also given a detail of the open

17   receivables that were then valued at $1.2 million, and he

18   was advised that these open receivables were probably not

19   collectible.

20         Bank One, who had a vested interest in getting

21   maximum value out of these assets, determined that $600,000

22   was a fair price for them.  And that's what they were sold

23   for.  The sale did not extinguish any creditors rights

24   against APS.  It simply sold the assets of APS.

25         There has been no evidence presented to this

1    Court that the coatings business as a business had any value

2    whatsoever.  There are no long term contracts.  The only

3    thing that APS was formed or Coatings was formed to do was

4    to sell assets, or the only reason that APC was formed to

5    was to sell coatings that had been manufactured by APS.

6           It turned out the coatings manufactured by

7    Advanced Polymer Sciences for use in the marine industry did

8    not suit that market.  So assets that were manufactured by a

9    third party, unrelated to Advanced Polymer Coatings or

10   Advanced Polymer Sciences, were then sold by APC.

11          Now, how does the coating business or the

12   coatings purchased from an independent company become an

13   asset of Advanced Polymer Sciences?  I mean it's not there.

14   Marnavi presents itself as some major creditor of Advanced

15   Polymer Sciences.  Marnavi was nothing.  Marnavi owed money

16   to Advanced Polymer Sciences.

17          They want to disregard all the elements of the

18   recognized causes of action or theories of liability that

19   imposes liability from one company to another simply because

20   they tell you that that is the right thing to do.  That it's

21   the fair thing to do.

22          Well, your Honor, they have never established

23   any damages.  They obtained a default judgment over in

24   London that was not defended.  The testimony and the

25   evidence that came out during discovery was that Jilmar

1    Shipping did not even own the *Joran* when it was coated.  It

2    had been sold long before.  And the only thing they paid was

3    $200,000 to recoat the bottom of these tanks because they

4    did not want to pay $200,000 to Advanced Polymer Sciences.

5         There is nothing unfair in leaving them exactly

6    where they were.  They purchased coating from a company that

7    went out of business.  Its secured creditor sold its assets

8    through a judicially supervised receivership.  Everything

9    was above board.  Everything they complain about was brought

10   to the Court's attention.

11        And to come in here and now say that they are

12   able to establish their judgment creditor status against

13   Advanced Polymer Sciences is just factually untrue.  They

14   cannot because there is no agreement to arbitrate.  And when

15   they say that if the parties agree to submit arbitrability

16   to the arbitrator, you can do that, but it needs to be in

17   the arbitration agreement.  That is the agreement that you

18   need to look to.

19        Is the agreement between Jilmar or the agreement

20   between Marnavi, GATT and SEC, does that agreement state

21   that the arbitrator shall have jurisdiction to determine his

22   jurisdiction?  It does not.  It's absolutely silent on that

23   topic.  It only says there is going to be arbitration in

24   London, England.  So there is no agreement to allow the

25   arbitrator to determine arbitrability.

1          So as a threshold matter, Jilmar is simply a

2   stranger to this entire proceeding because they were never

3   a party to an arbitration agreement with Advanced Polymer

4   Sciences.

5          And Marnavi, presenting themselves as agent,

6   doesn't change the fact.  Marnavi was a party to an

7   agreement that had an arbitration clause.  And the other

8   parties to that were GATT and SEC.  And they have obtained a

9   judgment against GATT -- or actually they could have

10  obtained a judgment had they brought it in their name but

11  they elected to bring the arbitration in Jilmar's name.

12  That was their decision made by their sophisticated counsel.

13  I can't help the fact that they did things improperly.

14          There was no collusion with Bank One, as counsel

15  has explained repeatedly.  It was a very adversarial position.

16  I challenged the authority of the arbitrator to do anything.

17  And Bank One was on the other side, challenging them to do the

18  most they could do.  The arbitrator brought these issues to

19  the Court's attention, and the Court, with full knowledge of

20  all the facts that they brought to you today, approved the

21  sale price and the assets were sold.

22          THE COURT:  Does the record show that the judge

23  in Ohio was aware of the arbitration proceeding involved in

24  Marnavi?

25          MR. MANOS:  No, no.  I did not advise the Court

1    of the arbitration proceeding.

2            THE COURT:  If you could just go back a few

3    seconds.  I'm not sure what you are saying when you say that

4    the receiver and the Court in Ohio were aware of everything

5    that I have heard today.

6            MR. MANOS:  About the asset transfers.  About

7    the fact that Donald Keehan owned these patents.  They have

8    talked repeatedly about how Advanced Polymer Sciences said

9    they had a patent on coating.  The patents were brought to

10   the judge's attention, so the Court was aware of that.  The

11   Court was aware of the competing claims to the assets that

12   were within the Court's jurisdiction.  The Court had the

13   list of the manufacturing assets that were not conveyed to

14   Advanced Polymer Coatings.

15           THE COURT:  By competing claims of assets, do

16   you mean among the Keehan entities?

17           MR. MANOS:  No, between Bank One.  Bank One

18   contended that they owned or had a security interest in

19   Donald Keehan's patents.

20           THE COURT:  I think I can short-circuit this.

21   All these arguments you are making now about what the Ohio

22   judge knew or the receiver knew, your contention is that

23   they knew all about Bank One's arguments and interests and

24   all of the Keehan entity interests.  You are not suggesting

25   that the folks in Ohio knew anything about Marnavi, about

1   the arbitration, about Jilmar, about the *Joran*?

2                MR. MANOS:  No.

3                THE COURT:  Okay.

4                MR. MANOS:  No.  No, they did not.  At that

5   point in time, the arbitration was kind of dormant.  Nothing

6   happened for a number of years.  I don't know why it came

7   out of the blue when, in 2004, they announced that they were

8   asking for final damages.  And it was at that point, I said

9   why are you even bothering?  The company has been dissolved.

10  It's been liquidated.  All of the assets are sold.  Here is

11  the case number.

12               But even after being told that, they went back

13  and gave an entry for the arbitrator to sign, and they now

14  treat that default as some kind of establishment that they

15  have been damaged in some fashion.

16               Your Honor, I'm not going to continue rehashing

17  arguments that I have made.  If you have any further

18  questions?

19               THE COURT:  What can you tell us about the U.S.

20  Attorney's letter?

21               MR. MANOS:  The U.S. Attorney's letter, they

22  obtained a $2 million cognovit judgment upon the -- a

23  guarantee on the Sava litigation.  I don't know how much you

24  want to get into the Sava litigation, but that is what put

25  APS out of business.  After Coatings was formed they,

1   continued manufacturing, and, in fact, had a joint venture

2   going on in Slovenia with a company called Sava.

3          They were to purchase approximately $3 million.

4   This joint venture over in Slovenia was going to purchase

5   approximately $3 million worth of equipment.  The construction

6   of that equipment was financed through Bank One as a second $2

7   million line that they were able to draw upon as pieces, parts

8   were ordered.

9          Bank One then guaranteed that loan through the

10  Ex-Im Bank.  It's kind of like an SBA loan.  We obtained a

11  very large judgment against Sava.  Ultimately, it was

12  reduced significantly on appeal, but when APS went out of

13  business, that loan was not repaid.  The Ex-Im bank, for

14  whatever reason, was not involved with the receivership.

15  They were aware of it, and we kept waiting for counsel to

16  make an appearance, but the government, for whatever reason,

17  did not take any action.  They paid the money to Bank One.

18         The U.S. Attorney took judgment against the

19  Keehans.  I wrote him a letter saying good luck in trying to

20  collect on this.  At the time, I honestly believed that

21  Advanced Polymer Coatings was an LLC and could not be

22  attached.  I subsequently came to find out that it had been

23  converted to a corporation at the recommendation of their

24  tax advisors so it could take advantage of some loss

25  carryovers, but my letter to the U.S. Attorney was you got

1    this business that has eight shareholders, and I can go to

2    the children and raise $200,000 if you will go away.

3            The U.S. Attorney came back and said we are not

4    going to enter into any type of settlement negotiations

5    until we see a personal financial statement from the

6    Keehans, at which point my representation of the Keehans in

7    connection with that issue terminated, and they retained

8    other counsel to go forward.  So that was the letter to the

9    U.S. Attorney.

10           THE COURT:  Okay.  Is there anything else you

11   want to add?

12           MR. MANOS:  No.

13           THE COURT:  Thank you very much.

14           All right.  I thank you all.  That concludes our

15   proceedings today.

16           MR. AMINI:  Your Honor?

17           THE COURT:  Is there anything further?

18           MR. AMINI:  Well, I don't want to be presumptuous.

19   I was going to make a suggestion, you know, in getting ready

20   for this, I realize it's a lot of material and it's very

21   unwieldy.  I wondered if your Honor might benefit from asking

22   both parties to present you with proposed findings of fact and

23   conclusions of law, which you could then do as you saw fit.

24   This is something in an ordered fashion that might help your

25   Honor.  And I mean that just in terms of assisting the Court

1    for no other reason.

2              THE COURT:  I appreciate the offer.  And if I

3    need anything further from you all, I will certainly reach

4    out to you for it.

5              We'll be in recess.

6              (Hearing ends at 3:33 p.m.)

7

8

9         I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.
10
                              /s Brian P. Gaffigan
11                           Official Court Reporter
                             U. S. District Court
12

13

14

15

16

17

18

19

20

21

22

23

24

25